# CV 09 1274

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D N.Y

★ MAR 26 2009 ★

LONG ISLAND OFFICE

KAY and GEORGE SULLIVAN,
MICHAEL and KATHLEEN TIRELLI, and
STEVE BONNANO
individually, and on behalf of all others
similarly situated,

   Plaintiffs,

  v.

AGAPE WORLD, INC. NICHOLAS
COSMO, AGAPE MERCHANT ADVANCE
LLC, JOHN DOES 1-12,
BANK OF AMERICA, N.A., MF GLOBAL,
INC.,TRANSACT FUTURES, ALARON
TRADING CORPORATION, Doing Business
As ALARON FUTURES AND OPTIONS,
and XYZ CORPS. 1-10,

   Defendants.

Civil Action No:

WEXLER, J.
BOYLE M.

**CLASS ACTION COMPLAINT**

(1) **SECURITIES FRAUD**
(2) **COMMON LAW FRAUD**
(3) **BREACH OF FIDUCIARY DUTY**
(4) **AIDING AND ABETTING**
  **COMMON LAW FRAUD**
(5) **AIDING AND ABETTING**
  **BREACH OF FIDUCIARY DUTY**
(6) **NEGLIGENCE**

**DEMAND FOR JURY TRIAL**

Plaintiffs, by and through their attorneys, file this Class Action Complaint against

Agape World Inc., Nicholas Cosmo, Agape Merchant Advance LLC, and John Does 1-12

(collectively, "Agape"), Bank of America, N.A. ("Bank of America"), MF Global, Inc.

("MF Global"), Transact Futures ("Transact"), Alaron Trading Corporation doing

business as Alaron Futures and Options ("Alaron") and XYZ Corps. 1-10, on behalf of

themselves and other similarly situated individuals or businesses who invested into

fraudulent schemes operated by Agape. Upon information and belief, as well as the

investigation of counsel, Plaintiff alleges as follows:

1

Dockets.Justia.com

## INTRODUCTION

1.    Starting in 2003, Nicholas Cosmo ("Cosmo"), a convicted felon who had just completed a 21 month sentence in Federal Prison in Allenwood, Pennsylvania commenced a fraudulent investment scheme through Agape, which was eventually comprised of two companies he controlled and approximately 12 brokers acting on Agape's behalf. Agape obtained approximately $400 million from investors using false pretenses. Thousands of blue collar investors, including police officers, post office employees, social security clerks, and widows investing life insurance proceeds, lost their entire life and retirement savings.

2.    From the start, defendant Bank of America ("Bank of America"), played an integral role in that scheme providing Agape's and Cosmo's scheme with substantial assistance. Without Bank of America's participation, the scheme would not have succeeded and grown to such an enormous size victimizing many life-long residents of Long Island, New York, and people of modest income and means.

3.    Through Agape, Cosmo falsely convinced Plaintiffs and other investors that he was financing bridge loans for construction projects or other real estate developments. He would offer participation interests in the return on these loans, but failed to advise investors that he re-sold those same interests hundreds of times to other unknowing investors. For example, he would make a $1 million dollar loan to a developer and collect $60 million from investors. He used the excess or "extra" money raised to: (1) pay handsome returns to early investors and his confederates; (2), reward and incentivize "brokers" who brought in new investor money: and (3) ultimately conduct rampant and speculative commodities trading. Throughout the

2

scheme he used investor funds to spend excessively on his own lavish personal lifestyle.

4.     Bank of America was at the epicenter of this scheme. The bank's brazen willingness to allow Cosmo and his cadre of brokers and sub-brokers, to have extraordinary access to its employees, infrastructure and banking services made the scheme work. In effect, Bank of America established, equipped and staffed a branch office at the heart of Agape's headquarters (the "Agape Branch" or the "Agape Branch of Bank of America"). With Bank of America's knowledge, this branch assisted, facilitated and furthered the fraudulent scheme as described more fully herein. This assistance included but was not limited to: (1) Bank of America assigning one or more representative to work directly out of Cosmo's office which was approximately 28 miles from the branch where Agape and Cosmo had their bank accounts; (2) Bank of America provided its onsite representatives at Agape with on site bank equipment and/or computer systems to enable direct access to Bank of America's accounts and systems; and (3) Bank of America's onsite representatives at Agape had the ability to monitor and check account balances, accept deposits and issue checks. Essentially, Bank of America established a fully functional bank branch manned by its own representatives within Agape's offices, which is contrary to normal banking practices.

5.     Bank of America, additionally, through its onsite Agape Branch, as well as its other branches which dealt with Agape, further provided substantial assistance to Agape's schemes by: (1) allowing a convicted felon to open, direct, control and have extraordinary access to at least two dozen accounts under different names; (2)

3

aggregating and approving the transfer of funds among Agape accounts on a regular basis (perhaps as often as once an evening) totaling several millions of dollars; (3) failing to detect that Agape and Cosmo failed to engage in legitimate business loans and instead were selling securities without required licenses or registration; (4) approving and effecting, on a regular basis, transfers of up to $100 million dollars in wires from Agape's accounts to commodities and futures trading firms for speculative transactions which looted Agape's assets; (5) failing to investigate the source of hundreds of millions of dollars of funds going into Agape's and Cosmo's accounts.

6.      Bank of America's onsite representatives had actual knowledge that Cosmo was commingling investor money, diverting investor money to his own accounts, engaging in virtually no legitimate business whatsoever and speculatively trading investor money in the commodities and futures markets.

7.      From November 2007 to January 2009, MF Global, Transact, and Alaron which are futures and commodities trading firms or merchants, and XYZ Corps. 1-10 (collectively, the "FCMs"), which represent other futures and commodities merchants, also had knowledge of, and provided substantial assistance to, Cosmo's fraudulent schemes. The FCMs established trading accounts for Cosmo and Agape despite the fact that Cosmo was barred for life by the Financial Industry Regulatory Authority ("FINRA") from association with any investment broker-dealer. Indeed, based on such facts, other similar firms refused Cosmo's business. As speculating in the futures markets became Agape's only business activity, the FCMs assisted Cosmo in running an illegal unregistered commodities pool. As a result, the Commodity

Futures Trading Commission ("CFTC") commenced a proceeding against Agape and Cosmo.

8.      Cosmo's and Agape's speculative commodities futures trading resulted in losses of $80 million of funds belonging to Plaintiffs who invested in Agape. Cosmo looted Agape with his trading through the FCMs which never should have accepted this business. The FCMs have "know your customer duties" which require these firms to make sure that customers like Cosmo and Agape are not trading with investor money.  Cosmo also assigned an uneducated and inexperienced "administrative assistant" to execute most of the trades.  This "assistant" had no training, licenses or knowledge about futures trading, particularly in executing trades on behalf of a commodities pool. The FCMs should have refused Agape's business, given their strict regulatory requirements.  In sum, the FCMs substantially assisted Agape's and Cosmo's fraud, and played a substantial role in the loss of Plaintiff and investor funds.

9.      Plaintiffs bring this action seeking monetary damages for the injury to its and the Class members' business or property caused by Defendants' fraud, breaches of fiduciary duty, aiding and abetting fraud, aiding and abetting a breach of fiduciary duty, and negligence, and they seek an accounting for the losses suffered.  Plaintiffs also bring this action seeking monetary damages for the injury to Plaintiffs and Class Members caused by Defendants' negligence and violations of common law.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and jurisdiction over the state law claims, and any

parties against whom no federal claim is asserted, pursuant to 28 U.S.C. § 1367, as all such claims are part of the same case or controversy. In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) as the aggregate amount in controversy exceeds $5,000,000 and at least one class member is a citizen of a State different from a defendant, and more than one third of all Class members may reside outside of the State of New York. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §1965(b) and (d).

11.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (b). Venue is also proper under 18 U.S.C. §1965(a) because all Defendants transact or have transacted business in this District at times material to this action.

12.     This action involves common issues of fact and grows out of the same events and transactions as *United States of America v. Nicholas Cosmo*, 09-MJ-0066 (E.D.N.Y.); *Triton Capital Partners, LLC, et al. v. Nicholas Cosmo, et al.*, 09-CV-0827 (E.D.N.Y. filed February 26, 2009); and *Heany, et al. v. Nicholas Cosmo, et al.*, 09-CV-0757 (E.D.N.Y. filed February 24, 2009)

**PARTIES**

13.     Plaintiffs Kay and George Sullivan reside in Rockaway Park, New York. Kay is a schoolteacher and George is a policeman and together they suffered a loss of approximately $180,000 from Agape's scheme.

14.     Plaintiffs Michael and Kathleen Tirelli reside in Patchouge, New York. Michael, who suffers from stomach cancer, is a musician and works in a clothing store, and Kathleen is a massage therapist and new mother. Together, they suffered a loss of approximately $125,000 from Agape's scheme.

15.     Plaintiff Steve Bonnano resides in Wantaugh, New York. He is a retired Captain with the New York Police Department who suffers from heart and back problems. He suffered a loss of approximately $100,000 from Agape's scheme.

16.     Defendant Agape World, Inc. ("Agape World") is a New York corporation that was organized in August 2000. Nicholas Cosmo was the President and controlling owner of this company. At all relevant times, its headquarters were located at 150 Motor Parkway, Hauppauge, New York, within the District.

17.     Defendant Nicholas Cosmo ("Cosmo") was the President and controlling owner of Agape World and AMA. He resided in Lake Grove, New York. Cosmo is a prior felon who, on January 15, 1999, pled guilty to mail fraud relating to an investment scheme and served 21 months in prison and was ordered to pay restitution of $177,000. As a result of the guilty plea, in 2000, FINRA revoked his stockbroker's license, fined him $68,209 and barred him from association with any investment or securities broker-dealer.

18.     Defendant Agape Merchants Advance LLC ("AMA") is a New York limited liability company that was organized in November 2007. Cosmo was the Managing Member and controlling member of AMA. It shared headquarters with Agape. John Does 1-12 are individuals whose identities are not known but who were "brokers" who acted as employees or agents of Agape by soliciting investors. The John Does 1-12 held accounts or subaccounts in the respective names on behalf of Agape, and received lucrative commissions and fees for bringing in new investor money. (together, Agape World, Cosmo, AMA and John Does 1-12 shall be referred to as "Agape").

19.    Defendant Bank of America, National Association ("Bank of America") is a subsidiary of Bank of America Corporation, a Delaware corporation headquartered in Charlotte, North Carolina. Bank of America provides a diverse range of banking services in 32 states including New York State. At relevant times, Bank of America had branches located at 190 Vanderbilt Motor Parkway, Hauppauge, New York and at 60 Hempstead Avenue, West Hempstead, New York. Bank of America also established a functioning branch office onsite at Agape's headquarters at 150 Motor Parkway in Hauppauge, New York.

20.    Defendant MF Global Inc. ("MF Global") is a futures and commodities firm with a principal place of business at 440 South LaSalle Street, 20thFloor, Chicago Illinois. At relevant times, Agape and/or Cosmo had a commodities and futures trading account with MF Global.

21.    Defendant Transact Futures ("Transact") is a futures and commodities firm with a principal place of business at 14 West Jackson Blvd., 24th Floor, Chicago, Illinois. At relevant times, Agape and/or Cosmo had a commodities and futures trading account with Transact.

22.    Defendant Alaron Trading Corporation ("Alaron") is a futures and commodities firm with a principal place of business at 822 W. Washington, Chicago, Illinois. At relevant times, Alaron was doing business as Alaron Futures and Options. Agape and/or Cosmo had a commodities and futures trading account with Alaron.

23.    Defendants XYZ Corps. 1-10 (the "FCMs") are futures and commodities firms or merchants whose identities are unknown at this time. Upon information and belief, Agape had commodities and futures trading accounts with these firms. These

8

accounts were identified in the CFTC proceeding against Agape, and the names of these firms will be ascertained during discovery.

## FACTS

### The Cosmo/Agape Ponzi Scheme

24. Commencing in 2003, and through to his arrest on January 19, 2009, Cosmo operated an elaborate Ponzi scheme. Initially through Agape World, and later AMA, Cosmo purportedly provided secured bridge loans and merchant advances to businesses or individuals who could not obtain financing through commercial banks. The bridge loans offered were short-term and supposedly secured by the underlying real estate or other assets. Cosmo and Agape sought investor money as capital for its bridge loans and promised investors returns of 12 to 15% of their money. Later, Cosmo supplemented his scheme by claiming to provide an investment vehicle into bridge loans for merchants carrying credit card accounts payable from month to month.

25. Agape's website provided the scheme with an air of legitimacy by, among other things, using background pictures of construction and infrastructure projects. A copy of Agape's website is annexed hereto as **Exhibit A**. The website states that "project developers and contractors have sealed our services thru 2008". This statement, like so many others made by Defendants, was false and fraudulent.

26. Agape's website also contained information for investors. Investors were advised that Agape did not decide to lend until it did "due diligence on the borrowers" and was "fully secure in [the] decision to take on the loan. Agape

9

represented that its "approved investors" would benefit from "99% security of [their] investment by first position UCC filing; "investors are in complete control of their funds and are able to access at any time"; "each loan is collateralized by 100% commercial asset lien"; "clients are consulted directly and personally with their executive every loan term"; and "loan terms range from 60 days to 18 months".

27.     These and similar false representations were made to investors who were attracted to Agape's seemingly safe and professional business plan and model. Based largely upon the strength of its purported plan, and its burgeoning reputation, Agape successfully attracted funds from investors.

28.     To further attract investor funds, Agape developed relationships with approximately 12 "brokers" and "sub-brokers", John Does 1 to 12, who worked as employees or agents of Agape. These brokers were given handsome cash payments for bringing new investors to Agape, and raising new capital, estimated in some cases to be in excess of $1 million dollars. These brokers also each had a bank account established in his or her name at Bank of America, which received investor funds. Bank of America, however, enabled Cosmo direct control over these funds, which would be "swept" into Agape's operating accounts at Bank of America on a daily basis. This and many other practices performed by the Bank should not have been permitted under recognized banking compliance regulations and standard anti-money laundering procedures.

29.     Agape, directly and through the brokers, was able to raise an estimated $400 million of investor funds. There are Agape investors located nationwide but many are

life-long residents of Long Island such as police officers, post office employees, social security clerks and widows investing life insurance proceeds.

30.     Agape was rapidly successful in drawing investment money. It soon could afford large office space at 150 Motor Parkway in Hauppauge, New York, and could hire numerous employees. Cosmo personally benefitted from this success with a lavish house and automobiles. His brokers also were well compensated and many received millions from the scheme for their recruitment of new, innocent investors. Agape's success, however, was not real, existed only for Cosmo and the other defendants, and was based entirely upon lies.

31.     In truth, Agape and Cosmo made only a handful of loans using investor funds. In reality, Agape would sell and repeatedly re-sell the same interests in a loan. For example, he would make a $1 million dollar loan to a developer and collect $60 million from investors, effectively selling and re-selling the same loan over and over. Agape never actually transacted the level of legitimate loan work and business needed to substantiate (or repay) the hundreds of millions of investor dollars received.

32.     Instead, Agape ran a fraudulent Ponzi scheme. Agape had all investors write their investment checks or wire their deposits into two primary operating accounts at Bank of America. Funds were also deposited directly into a series of accounts that were in the name of Agape brokers. Under Cosmo's direction, Bank of America commingled all of these funds into these two accounts. Funds were never segregated by investor or by underlying project. This commingling of investor money was contrary to standard and recognized banking practices.

11

33.     Using investor money, Agape would issue returns to the early investors, pay interest to investors and pay its "brokers" handsome commissions and fees.

34.     Agape also secretly engaged in highly speculative and risky commodities and futures trading with investor money, and reportedly lost $80 million in such trading. Upon information and belief, Cosmo sought to earn enormous trading profits that would replace the lack of business revenue from legitimate loans which he was not making.

35.     In short, Agape and Cosmo, with the substantial assistance of Bank of America, engaged in a massive fraud and deceit upon Plaintiffs and other investors to "steal" $400 million in capital, and then covered up the scheme and lies for as long as possible until the cash ran out. On January 19, 2009, Cosmo was arrested and charged with bank and mail fraud and other related crimes. He awaits trial and faces up to 30 years in prison if convicted. A copy of the criminal complaint is annexed hereto as **Exhibit B**.

## Bank of America's Participation In The Fraud

36.     Historically, Ponzi schemes have not had the benefit of an affiliation with a credible and recognizable financial institution like Bank of America, in part because financial institutions have a responsibility to avoid aiding and abetting illegal activities. The legal requirements and best practices that set the standard for banking institutions are well outlined in various government and industry publications, including the Federal Financial Institutions Examinations Council's 2007 publication, "Bank Secrecy Act/Anti-Money Laundering Examination Manual." In addition, all

banks and financial institutions have the burden of knowing their customers and indentifying and reporting suspicious transactions.

37. To meet such responsibilities and obligations, banks must have four types of programs in place, known in the industry as the "four pillars": (1) a system of internal controls to ensure ongoing compliance; (2) independent testing of compliance; (3) designation of an individual or individuals responsible for compliance; and (training for appropriate personnel on potentially fraudulent transactions and money laundering activities. The requirements for these pillars have grown increasingly demanding, particularly as relates to customer due diligence and recognition of suspicious transactions.

38. Because of such obligations, Bank of America further holds itself out to the public as having a policy of preventing crime and fraud via its website at http://investor.bankofamerica.com/ phoenix.zhtml?c=71595&p=irol-govhighlights. On the website, Bank of America states that:

> Crime has a destructive and devastating effect on the communities in which we operate. Safeguarding the global financial system is critically important for the economic and national security of the jurisdictions in which we operate. **Accordingly, it is the policy of Bank of America to take all reasonable and appropriate steps to prevent persons engaged in money laundering, fraud, or other financial crime,** including the financing of terrorists or terrorist operations, (hereinafter collectively referred to as "money laundering") from utilizing Bank of America products and services.

39. Bank of America's program, however, failed to (1) respond to the illegitimacy and unlawful nature of Agape's non-existent bridge loan business, (2) stop Agape and Cosmo from using the bank's products and services in furtherance of illicit purposes, and (3) halt Bank of America's involvement in the scheme including the establishment and maintenance of the Agape Branch.

40. Indeed, Bank of America failed to live up to any of its responsibilities or obligations in the case of Agape. Rather, Bank of America was at the center of Agape's fraudulent Ponzi scheme, and it did nothing to stop the scheme or halt its own involvement in that scheme. It provided Cosmo and his brokers with extraordinary access to its employees, infrastructure and banking services. In effect, Bank of America knowingly participated and substantially assisted in Agape's fraud. This fact is demonstrated by Bank of America allowing the establishment and operation of an onsite branch office at Agape's headquarters -- an "Agape Branch" -- to assist, facilitate and further the fraudulent scheme.

## The Bank of America "Agape Branch"

41. During its existence, Agape had a longstanding relationship with Bank of America, and its accounts were handled by the Bank of America branch located at 60 Hempstead Avenue, West Hempstead, NY 11552 ("Bank of America West Hempstead"). This is highly suspicious as the Bank of America West Hempstead branch is located 28 miles or a 36 minute drive from Agape's headquarters in Hauppauge past several other Bank of America branches, including one in Hauppauge in the very same commercial strip, less than a block from the Agape Headquarters.

42. Agape and Cosmo transacted business through Bank of America West Hempstead because this branch would provide extraordinary and additional services for Agape, its single largest customer. Additionally, upon information and belief, Cosmo's wife worked at one time at Bank of America West Hempstead and was

14

known favorably by bank representatives, supervisors and compliance personnel at that office.

43.     Given the close and special relationship that Agape had with the Bank of America branch in West Hempstead, Bank of America took the extraordinary measure of effectively establishing a bank branch office within Agape -- the "Agape Branch". This branch was staffed by a female bank representative who had been Agape's representative at Bank of America West Hempstead, but (on information and belief) was dedicated solely to Agape's needs and purposes. At other times, other bank representatives also were assigned to the Agape Branch, also (on information and belief) for the sole needs and purposes of Agape.

44.     The Agape Branch of Bank of America consisted of a private office located behind but directly connected to Agape's main boardroom. The office was located entirely within Agape's office space, with no separate entrance or exit way. The onsite Bank of America representative in the office would have to walk through the entire length of Agape's office, and past its private offices including Cosmo's office, to access or leave. The Bank of America onsite representative in the branch had (1) access to virtually all aspects of Agape's business; (2) direct personal contact with its employees; and (3) could overhear and participate in business conversations.

45.     Within the dedicated private office at Agape, the Bank of America representative had the run of her office, with a desk, computer system and files. The office had every appearance of a permanent established office. The office also had computers and/or other equipment providing a direct link to Agape's accounts at

15

Bank of America and the ability for processing checks and deposits that would ordinarily only be found at a normal bank branch.

46.     There did not appear to be any Bank of America supervisors or compliance personnel present at Agape to supervise this outside access to the bank's internal systems. Rather, it was the needs and purposes of Agape that drove operations.

47.     At the Agape Branch, the Bank of America representative had full access to Cosmo, and other Agape officers and employees, and they had full access to the bank's systems relevant to each of their many accounts. This access fully enabled Cosmo to perpetrate his fraudulent schemes to defraud investors by permitting him to transfer funds, make deposits, issue withdrawals--all outside of normal bank supervisory and compliance procedures and systems.

48.     The Agape Branch of Bank of America was not a secret. Most Agape employees and brokers were fully aware of the Agape Branch, and that Bank of America had a representative onsite. Several investors came to learn of the Agape Branch and its onsite bank representative. In short, Bank of America placed more than just its "imprimatur" on Agape and the propriety of its operations to the Agape employees, and investors who learned of the office. It became an integral and known part of the operation.

**An Investor Check for $162,500 Was Issued By the Agape Branch**

49.     During the December 2008 holiday season and during increased concerns about the state of the economy, numerous Agape investors wanted to withdraw cash. In particular, one investor wanted to withdraw approximately $200,000 of the funds he had invested in Agape.

16

50.     On December 24, 2008, an Agape broker went to Agape's office at 9:00 a.m. hoping to meet with Cosmo to obtain a check for the investor. At approximately 10:00 a.m., the Agape broker spoke with Cosmo and demanded that the investor receive the $200,000 immediately. The Agape broker was then directed to go to the "back office" at Agape (i.e., the Agape Branch) where he met with the dedicated Bank of America representative.

51.     The Agape broker requested a check for the investor, and the Bank of America representative then directly accessed an Agape account from her linked computer system, and issued a check from one of Agape's accounts to the investor for $162,500. The Bank of America representative then took the check to Cosmo's office which appeared to be the closest private office at Agape to the bank office where Cosmo signed the check and then gave it to the Agape broker who then gave it over to the investor.

52.     This incident reveals how Bank of America's presence amounted to Agape having in effect its own bank branch onsite -- the Agape Branch -- and how the proximity of a Bank of America representative with full access to bank computers and systems substantially assisted Agape's fraudulent schemes allowing it to move its monies rapidly and with little or no oversight, and (by acting as Agape's personal assistant) adding a patina of legitimacy to otherwise illegitimate acts.

**Bank of America Failed To Comply With Recognized**
**Compliance And Regulatory Standards**

53.     In addition to supplying personnel and creating the Agape Branch, Bank of America also had knowledge that Agape was engaged in highly suspicious and possible illegal activity on a regular and consistent basis. Rather than stop this

17

conduct, Bank of America provided substantial assistance to Agape and facilitated this conduct which fueled the mechanics of Agape's fraud.

54.     First of all, Agape permitted Cosmo, a convicted felon, to open and control at least two dozen bank accounts held under various names. Bank of America knew or should have known of Cosmo's felony conviction from credit searches it performed in connection with personal and/or business loans extended to him and Agape. Notwithstanding, Bank of America permitted Cosmo to control numerous bank accounts which held investor money and move monies without oversight or concern from account to account.

55.     Bank of America also permitted Cosmo and Agape to commingle investor money into Agape's "operating" accounts, with no segregation by investor name or by bridge loan. Bank of America had actual knowledge that Agape's deposits came from third-party investors. However, Agape never obtained any securities licenses required to solicit investors or registered as an issuer of securities for the interests it was selling to investors. Bank of America knew or should have known that Agape was committing violations of several federal and state securities laws through its transactions in the various bank accounts it held. Bank of America should have required segregation of investor funds and/or that funds be held in escrow accounts.

56.     Upon information and belief, Agape maintained 13 separate accounts at Bank of America, one of which was Agape's main "operating account" with 12 subsidiary accounts. At the end of each day, the 12 accounts transferred their funds to Agape's main account. AMA operated in the same manner with 13 accounts, a main operating account and 12 subsidiary accounts, with 12 accounts sweeping all the funds at the

end of the day into the main account. Agape performed these suspicious daily sweeps for internal accounting purposes to credit and account for the broker's fees and commissions for raising capital.

57.     With these 13 accounts, Agape took in hundreds of millions of investor funds, but made only a few very minor bridge loans that were its primary business. At any time, Bank of America's review of these accounts would have seen that Agape utilized the investor deposits it received for: 1) its own operating expenses including lucrative payments to its referring brokers; 2) wires and transfers totaling $100 million out to MF Global and the FCMs for speculation in the commodities and futures markets; 3) payments to Cosmo for his own lavish personal expenses; and 4) the issuance of interest payments or redemptions to investors. Bank of America could plainly see that all investor deposits and withdrawals went into and out of Agape's operating account, and Agape could not have gotten away with its fraud without the ability to freely move around, deposit, withdraw and transfer funds.

58.     Cosmo was also wiring funds out of the country to banks in Panama and/or Switzerland. Before his arrest, he reportedly visited Switzerland for the purpose of opening a Swiss bank account. Agape also wired funds out of the country to take advantage of interest earned from foreign deposits during after market hours.

59.     Multiple accounts and the other conduct described herein are all common "red flags" and recognized warnings to financial institutions to investigate, in order to satisfy their obligations under the Bank Secrecy Act and Anti Money Laundering statutes, that deposited funds are generated from a legitimate source of business operations.

60.     Federal laws and regulations, including but not limited to the Bank Secrecy

Act, 31 U.S.C. §5311-5330, require Bank of America to file reports with federal law

enforcement officials and the Department of the Treasury for suspicious activities and

large currency transactions. Specifically, a Suspicious Activity Report must be filed

regarding bank transactions or attempted transactions involving $5,000 or more that

the financial institution knows, suspects, or has reason to suspect that the money was

derived from illegal activities. Also, it must report cash transactions of $10,000 or

more. Bank of America should have filed reports for the hundreds of millions of

dollars that flowed through Agape's Bank of America accounts until January 2009,

which reports should have put Bank of America on notice of Agape's potentially

fraudulent conduct.

Bank of America continued over many months to aid and abet Agape's fraud and

schemes despite several indicators of fraud and other suspicious conduct, including:

(1) Agape's illegal raising of money from investors without required securities

registration or licenses; (2) suspicious transfers of hundreds of millions of investor

funds for purposes unrelated to Agape's purported business including $100 million to

FCMs for speculation in the futures markets; (3) suspicious wires and transfers of

funds out of the country; and (4) the well-known existence and prosecutions of

numerous Ponzi schemes and persistent and high profile warnings from regulators.

These facts, and others alleged herein, include many "red flags" of the kind

specifically identified as "Money Laundering Red Flags" by the Office of the

Comptroller of the Currency in its publication for bankers, "Money Laundering: A

Banker's Guide to Avoiding Problems." Bank of America, however, failed to heed these clear warning signs.

61.    Bank of America received significant fees from the financial transactions conducted in connection with Agape's business, the personal and business loans made to Agape, Cosmo and other Agape investors and/or employees.

**Bank of America Lent Its Reputation To**
**Agape And Endorsed Its Fraud And Lies**

62.    In addition to the foregoing, Bank of America lent its name and reputation to Agape, and endorsed, rather than denounce, its fraud and lies on several separate occasions.    This conduct by Bank of America substantially assisted Agape's fraudulent schemes by giving investors confidence and reassurance from Agape's affiliation with the bank.  This conduct also delayed detection by investors of Agape's schemes.

63.    At the time of their investment with Agape, most investors were advised of its close relationship with Bank of America.  Bank of America's name appears as "Banking Agent" on the Agape's investment forms which were to be completed by investors.  Investors were instructed to write their checks out to Agape's account at Bank of America.  Bank of America's name and reputation were thus incorporated and used as part of the selling process by Agape to investors.

64.    In marketing materials sent to investors, Agape touted its relationship with Bank of America.  Upon information and belief, Bank of American was aware and condoned Agape's use of its name in investor contracts and marketing materials.

65.    In addition, various Agape investors borrowed funds from Bank of America through home equity or other loans to invest in Agape.  For these investors, the Bank

of America representative assisting them with the loan knew that the loan proceeds were originated to make investments with Agape. Theses investors were told by their Bank of America representative that making the loan to invest with Agape was a "great idea". Unfortunately, these investors have lost all of their money with Agape, and taking a loan for investment purposes was clearly not suitable for them.

66.     Upon multiple occasions, Bank of America representatives gave endorsements to investors about Agape or its business. For example, one Bank of America representative who was previously employed at the Bank of America West Hempstead branch, but later moved to a Wantaugh branch, stated to an investor that Agape was a "wonderful company" which had a substantial account at the bank and that Cosmo was a "great guy." This Bank of America employee further stated that she would "invest in the company if she could but there was a conflict of interest" given where she worked.

67.     Additionally, one Agape broker was advised by Cosmo that an investor's request for withdrawal of funds was delayed because Agape was waiting for a $28 million "balloon payment" from Bank of America on the Carriage House Marine Development Project in Maine. Carriage House was a purported $83 million loan made by Agape and the broker was repeatedly told that the "balloon payment" would be coming in that would provide sufficient funds to pay numerous investors who were seeking redemptions.

68.     The Agape broker went to the Agape Branch and asked the onsite Bank of America representative if Agape had received the $28 million balloon payment which Cosmo told him was imminent. The Bank of America representative indicated that

balloon payment from Carnegie House had "not hit yet". However, the Bank of America representative failed to inform the Agape broker that the balloon payment was only $1 million and not $28 million, and that Cosmo had lied about the amount of funds expected. Her failure to tell the truth and reveal the lie constitutes fraud by material omission as well as furthered the lie that Agape's business was legitimate and thriving.

69.     In sum, Bank of America's conduct provided substantial assistance to Cosmo's and Agape's known fraud. Bank of America's onsite representatives and compliance personnel had actual knowledge that Cosmo was commingling investor money, diverting investor money to his own accounts, engaging in no legitimate business and speculatively trading investor money in the commodities and futures markets. Bank of America not only assisted Agape with its actions but provided an onsite Agape Branch complete with access to its systems and a personal representative. Accordingly, Bank of America should be held liable for Agape's fraud which destroyed $400 million of investor money.

70.     This is not the first-time Bank of America has been the subject of claims by its customers for widespread institutional failures to comply with its requirements under the Bank Secrecy Act/Anti-Money Laundering laws. In *Collins et al. v. Adsurfdaily, Inc.*, 09-CV-00100 (D.D.C. filed January 15, 2009), Bank of America was sued by online advertising consumers for its role in providing substantial assistance to another Ponzi scheme in the tens of millions. In that case, Bank of America likewise allegedly breached its obligations and duties to detect and prevent fraud and protect consumers. Accordingly, Bank of America has systemic inadequacies and

institutional failures which put all banking customers and the public at significant risk.

## MF Global And The FCMs' Participation In The Fraud

71.    From November 2007 to January 2009, MF Global, Transact and Alaron, futures and commodities trading firms, and XYZ Corps. 1-10 (the "FCMs"), which represent other futures and commodities merchants and trading firms whose identities are unknown at this time, also provided substantial assistance to Cosmo's fraudulent schemes. MF Global, Transact, Alaron and the FCMs established trading accounts for Cosmo and Agape despite the fact that Cosmo was barred by FINRA for life from association with any investment broker-dealer. Other firms such as Dorman Trading and R.J. O'Brien refused Cosmo's business. As speculating in the futures markets was Agape's only business activity, MF Global and the FCMs assisted Cosmo in running an illegal unregistered commodities pool. As a result, the Commodity Futures Trading Commission ("CFTC") commenced a proceeding against Agape and Cosmo. A copy of the CFTC's Complaint is annexed hereto as **Exhibit C**.

72.    Cosmo's and Agape's speculative commodities futures trading resulted in losses which reportedly wiped out $80 million of the investor funds. Cosmo looted Agape with his trading through MF Global, Transact, Alaron and the FCMs which never should have accepted this business. MF Global and the FCMs have "know your customer duties" which require these firms to make sure that Cosmo and Agape were not trading with investor money. Had the FCMs simply reviewed Agape's website, they would have realized that he was trading other investors' money without obtaining proper registration. Cosmo also assigned an uneducated and inexperienced

24

"administrative assistant" to execute most of the trades. This "assistant" had no understanding of what she was doing, and MF Global and the FCMs should never have done business through her.

73.     In sum, MF Global and the FCMs substantially assisted Agape's and Cosmo's fraud, and the trading losses perpetrated even further fraud.

74.     Upon information and belief, Cosmo began trading on the commodities market when he finally needed some manner of generating revenues to cover calls from investors for monies. Upon information and belief, Cosmo traded futures with Agape funds through the FCMs to generate revenues. Instead, he suffered enormous losses from his trading which put more pressure on him to raise additional money from investors. His futures trading perpetuated the cycle, resulting in further fraud against additional investors, as well as increased losses.

75.     Upon information and belief, the FCMs profited substantially from Cosmo's and Agape's illicit trading. The trading generated enormous revenues for the FCMs at the expense of Agape's investors. Thus, the FCMs had every incentive to "look the other way" about the source of Agape's funds, and ignore the "red flags" that Cosmo and Agape was illicitly trading investor money and looting his company.

**CLASS ACTION ALLEGATIONS**

76.     Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), Plaintiffs bring this nationwide class action on behalf of themselves and all other persons in the United States who within the applicable statute of limitations of the date of the commencement of this action have lost any money invested or paid to Agape. This class seeks certification for claims for declaratory and injunctive relief, and for

25

damages caused by securities fraud, common law fraud and breach of fiduciary duty, and aiding and abetting fraud, breach of fiduciary duty and negligence.

77. Excluded from the Class are all Defendants and the directors, officers, predecessors, successors, affiliates, agents, co-conspirators and employees of all Defendants, as well as the immediate family members of such persons.

78. All Class members have suffered injury to their property by reason of all Defendants' unlawful course of conduct, including their fraud, breaches of fiduciary duties, and aiding and abetting fraud and breaches of fiduciary duties.

79. The Class is reasonably estimated to be in the range of 1,500 to 6,000 members, and is thus so numerous that joinder of all its members is impracticable. The precise number of Class members and their addresses are unknown to Plaintiffs, but can be ascertained through appropriate discovery of all of Defendants' records. Class members may be notified of the pendency of this action by publication and/or other notice.

80. There is a well-defined community of interest in the relevant questions of law and fact affecting putative Class members. Common questions of law and fact predominate over any individual questions affecting Class members, including but not limited to whether: (1) Agape and Cosmo misrepresented the loan investments they offered to Plaintiffs and obtained investor money through securities fraud, fraud, deceit and false pretenses; (2) Agape and Cosmo instead ran a Ponzi scheme with investor funds; (3) Agape and Cosmo illicitly traded $100 million of investor funds speculating in the commodities and futures markets; (4) Bank of America substantially assisted Agape's and Cosmo's fraud through its establishment of the

26

Agape Branch, by placing an onsite bank representative, computer systems and equipment at Agape; (5) Bank of America substantially assisted Agape's and Cosmo's fraud by breaching its obligations under the Bank Secrecy Act and Anti-Money Laundering laws; (6) Bank of America aided and abetted Agape's and Cosmo's fraud; and (7) the FCMs aided and abetted Agape's and Cosmo's fraud.

81.    The claims of Plaintiffs and other Class members have a common origin and share a common basis. The claims originate from the same illegal conduct alleged herein on the part of all Defendants and other unnamed co-conspirators and their acts in furtherance of the illegal conduct. Plaintiffs' claims are typical of those of the absent Class members. If brought and prosecuted individually, the claims of each Class member would require proof of many of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

82.    Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or that directly and irrevocably conflict with the interests of other Class members. Plaintiffs are willing and prepared to serve the Court and the putative Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs have retained the services of counsel, identified below on the signature page, who are experienced in complex class-action litigation and in particular actions involving consumer matters. Plaintiffs' counsel will adequately prosecute this action and will otherwise assert, protect, and fairly and adequately represent Plaintiffs and all absent Class members.

**Rule 23(b)(3)**

83.     The prosecution of separate action by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the class. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof, and legal theories would also create and allow the existence of inconsistent and incompatible rights within the Class.

84.     A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because: (1) individual claims by the Class members would be impracticable as the costs of pursuit would far exceed what any one Class member has at stake; (2) little individual litigation has been commenced over the controversies alleged in this Complaint, and individual Class members are unlikely to have an interest in separately prosecuting and controlling individual actions; (3) the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and (4) the proposed class action is manageable.

**Rule 23(b)(2)**

85.     The Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

**ALLEGED COUNTS**

**COUNT ONE**
**SECURITIES FRAUD**
**(Agape World, Cosmo, AMA and John Does 1-10)**

86.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

87.    Defendants, Agape World, Cosmo, AMA and John Does 1-10 violated §10b of the Exchange Act and Rule 10b-5 through the use of the mails and means of interstate commerce fraudulently induced Plaintiffs to purchase securities being solicited and marketed by these Defendants through the use of materially false and misleading sales materials, oral representations, electronic communications.

88.    These Defendants knowingly made material false statements to Plaintiffs in connection with the securities offered about Agape's backgrounds, business and operations, handling of investor money, and source and application by Agape of investor funds.  These Defendants made false representations, among other things, about the business reputation of principals of Agape, the legality of Agape's program, the ability of Agape investors to earn investment returns while their investment principal was secure, and the ability of Agape investors to redeem their investments and receive the return of their money. Furthermore, these Defendants touted and utilized Agape's relationship with Bank of America to enhance the apparent legitimacy of the scheme and to promote the ease of financial transactions with Agape through Bank of America. These Defendants induced through materially false statements and omissions the Plaintiffs and Class members who justifiably relied upon them, into making investments in securities through Agape, and entrusting funds to Agape.  By so doing, these Defendants committed securities fraud under §10b of the Exchange Act and Rule 10b-5.

89. As a result of these Defendants' securities fraud, Plaintiffs and the Class members have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

## COUNT TWO
## COMMON LAW FRAUD
**(Agape World, Cosmo, AMA and John Does 1-10)**

90. Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

91. Defendants Agape World, Cosmo, AMA and John Does 1-10 owed duties to Plaintiffs and Class members to truthfully and accurately communicate to them and to disclose material information about Agape and Cosmo, their backgrounds and experience, their loan investment plan, their business and operations, the returns earned by investors, the source and application of Agape's operating funds, and Agape's handling of funds received from investors. These Defendants had further duties to truthfully and accurately communicate to investors Agape's true financial condition and any other information which might reasonably be expected to affect an investor's decision-making.

92. These Defendants breached their obligations to investors by deceiving, misrepresenting, lying and materially omitting numerous facts or information about their backgrounds, business and operations, handling of investor money, and source and application by Agape of investor funds. These Defendants made false representations, among other things, about the business reputation of principals of Agape, the legality of the Agape's program, the ability of Agape investors members

30

to earn investment returns while their investment principal was secure, and the ability of Agape investors to redeem their investments and receive the return of their money. Furthermore, these Defendants touted and utilized Agape's relationship with Bank of America to enhance the apparent legitimacy of the scheme and to promote the ease of financial transactions with Agape through Bank of America. These Defendants induced the investors based upon deceit, fraud and false pretenses into making investments through Agape, and entrusting funds to Agape. By so doing, these Defendants committed common law fraud, deceit and misrepresentation towards Plaintiffs and Class members. Plaintiffs and Class members thereby lost money that was paid to Agape.

93.     As a result of these Defendants' common law fraud, deceit and misrepresentation, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

**COUNT THREE**
**BREACH OF FIDUCIARY DUTY**
**(Agape World, Cosmo, AMA and John Does 1-10)**

94.     Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

95.     Defendants Agape World, Cosmo, AMA and John Does 1-10 owed a fiduciary duty to Plaintiffs and Class members. These Defendants gained the trust and confidence of Plaintiffs and Class members by the assured legality, safety, honesty and success of Agape's loan investment program.

96.     These Defendants breached the obligations and fiduciary duties of care,
loyalty, reasonable inquiry, oversight, good faith and supervision. These Defendants
made representations, among other things, about the business reputation of principals
of Agape, the legality of the Agape's program, the ability of Agape investors
members to earn investment returns while their investment principal was secure, and
the ability of Agape investors to redeem their investments and receive the return of
their money. Furthermore, these Defendants touted and utilized Agape's relationship
with Bank of America to enhance the apparent legitimacy of the scheme and to
promote the ease of financial transactions with Agape through Bank of America.
These Defendants established a fiduciary duty by building a relationship of
confidence and trust with investors by advising them on loan investments to make,
amounts to invest and assisting the investors in making investments through Agape.
By so doing, these Defendants undertook to provide financial advice to Plaintiffs and
Class members and to hold in trust investor funds for the purpose for which they were
obtained. These Defendants breached their fiduciary duties to Plaintiffs and Class
members by making false representations and promises about Agape's non-existent
loan investments, by withholding from Plaintiffs and Class members the return of
principal on investments Plaintiffs and Class members made or paid to Agape, by
speculatively trading in the commodities and futures markets and by engaging in a
Ponzi scheme. Plaintiffs and Class members thereby lost money that was paid to
Agape.

97.     As a result of these Defendants' breaches of their fiduciary duty, Plaintiffs and the Class members have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

**COUNT FOUR.**
**AIDING AND ABETTING COMMON LAW FRAUD**
**(Bank of America and the FCMs)**

98.     Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

99.     Defendants Agape World, Cosmo, AMA and John Does 1-10 owed duties to Plaintiffs and Class members to truthfully and accurately communicate to them and to disclose material information about Agape and Cosmo, their backgrounds and experience, their loan investment plan, their business and operations, the returns earned by investors, the source and application of Agape's operating funds, and Agape's handling of funds received from investors. These Defendants breached their obligations to investors by deceiving, misrepresenting, lying and materially omitting numerous facts or information about their backgrounds, business and operations, handling of investor money, and source and application by Agape of investor funds. By so doing, these Defendants committed fraud, deceit and misrepresentation towards Plaintiffs and Class members.

100.    Bank of America aided and abetted, encouraged, and rendered substantial assistance to these Defendants to accomplish the fraud and wrongful acts complained of herein. In aiding and abetting and substantially assisting the commission of the acts complained of, Bank of America acted with an awareness of Agape's wrongdoing and realized that its conduct would substantially assist the

33

accomplishment of the wrongful conduct and scheme alleged herein, including but not limited to: (1) Bank of America's assignment of more than one representative to work out of Cosmo's office; (2) Bank of America provided its onsite representatives at Agape with on site bank equipment and/or computer systems, and direct and immediate access to Bank of America's accounts and systems; and (3) Bank of America's onsite representatives at Agape had the ability to monitor and check account balances, accept deposits and issue checks. Essentially, Bank of America established a fully functional bank branch manned by its own representatives within Agape's offices -- the Agape Branch -- which provided assistance to Agape's and Cosmo's schemes.

101.    Additionally, Bank of America, through its onsite Agape Branch, as well as its other branches which dealt with Agape further provided substantial knowing assistance to Agape's schemes through: (1) contrary to industry standards and in violation of recognized compliance requirements, allowing a convicted felon to control at least two dozen actively utilized and interrelated accounts, all under different names; (2) on a regular basis (perhaps as often as once an evening) aggregating funds totaling several millions of dollars and approving and effecting transfers of the funds between and among various Agape bank accounts; (3) failing to act on the fact that Agape and Cosmo engaged in no legitimate business loans and were selling securities with required licenses or registration; (4) on a regular basis, approving and effecting transfers of up to $100 million dollars in wires to commodities and futures trading firms for speculative transactions which looted Agape's assets; and (5) failing to investigate the hundreds of millions of dollars of

34

transferred funds and funds going into Cosmo's accounts (and particularly given his criminal record and lack of legitimate business enterprise to support the account) despite compliance and legal requirements and its own policies and procedures for fraud detection.

102. Bank of America further provided substantial assistance to Agape's and Cosmo's known fraud. Upon information and belief, Bank of America's onsite representatives and compliance personnel had actual knowledge that Cosmo was commingling investor money, diverting investor money to his own accounts, engaging in virtually no legitimate business whatsoever and speculatively trading investor money in the commodities and futures markets. Bank of America should be held liable for its wrongful acts which aided and abetted the fraud committed against Plaintiffs and the Class members.

103. The FCMs aided and abetted, encouraged, and rendered substantial assistance to these Defendants to accomplish the fraud and wrongful acts complained of herein. In aiding and abetting and substantially assisting the commission of the acts complained of, the FCMs acted with an awareness of Agape's wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein, including but not limited: (1) aiding and facilitating Cosmo who was barred from association with any investment broker-dealer to run an illegal unregistered commodities pool; (2) aiding and facilitating the looting of Agape through highly speculative commodities and futures trading which resulted in $80 million of losses; (3) breaching its "know your customer" obligations; (4) aiding and facilitating an unqualified "administrative assistant" to trade $100

35

million in the commodities and futures markets; (5) aiding and assisting Agape's Ponzi scheme by accepting deposits and wire transfers without verifying the source and propriety of the funds for trading. This conduct by FCMs aided and abetted the fraud perpetrated against the Plaintiffs and the Class members.

104. As a result of the wrongful conduct of Bank of America and the FCMs, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

### COUNT FIVE
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Bank of America and the FCMs)

105. Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein

106. Defendants, Agape World, Cosmo, AMA and John Does 1-10 owe a fiduciary duty to Plaintiffs and Class members. These Defendants breached the obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision. These Defendants breached these fiduciary obligations and duties by (1) making representations, among other things, about the business reputation of principals of Agape, the legality of Agape's program, the ability of Agape investors to earn investment returns while their investment principal was secure, and the ability of Agape investors to redeem their investments and receive the return of their money; (2) diverting Plaintiffs and Class members' money from the purposes for which it was given to Agape; (3) withholding from Plaintiffs and Class members the return of principal on investments Plaintiffs and Class members made or paid to Agape; and

(4) using investor funds for trading in the speculative commodities and futures markets; and (5) engaging in a Ponzi scheme.

107.    Bank of America aided and abetted, encouraged, and rendered substantial assistance to these Defendants for wrongful acts complained of herein which breached their fiduciary duties. In aiding and abetting and substantially assisting the commission of the acts complained of, Bank of America acted with an awareness of Agape's wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein, including but not limited to: (1) Bank of America's assignment of more than one representative to work out of Cosmo's office which was approximately 28 miles from the branch where Agape and Cosmo had their bank accounts; (2) Bank of America provided its onsite representatives at Agape with on site bank equipment and/or computer systems and direct access to Bank of America's accounts and systems; and (3) Bank of America's onsite representatives at Agape had the ability to monitor and check account balances, accept deposits and issue checks. Essentially, Bank of America established a fully functional bank branch manned by its own representatives within Agape's offices -- the Agape Branch -- which provided assistance to Agape's and Cosmo's schemes.

108.    Additionally, Bank of America, through its onsite Agape Branch, as well as its other branches which dealt with Agape further provided substantial knowing assistance to Agape's schemes through: (1) contrary to industry standards and in violation of recognized compliance requirements, allowed a convicted felon to control at least  two dozen accounts, all under different names; (2) on a regular basis

(perhaps as often as once an evening) aggregating funds totaling several millions of dollars and approving and effecting transfers of the funds between and among various Agape bank accounts; (3) failing to detect that Agape and Cosmo engaged in no legitimate business loans and were selling securities with required licenses or registration; (4) on a regular basis, approving and effecting transfers of up to $100 million dollars in wires to commodities and futures trading firms for speculative transactions which looted Agape's assets; (5) failing to investigate the hundreds of millions of dollars of transferred funds and funds going into Cosmo's accounts (and particularly given his criminal record and lack of legitimate business enterprise to support the account) despite compliance and legal requirements and its own policies and procedures for fraud detection.

109.    Bank of America further provided substantial assistance to Agape's and Cosmo's known fraud. Upon information and belief, Bank of America's onsite representatives and compliance personnel had actual knowledge that Cosmo was commingling investor money, diverting investor money to his own accounts, engaging in virtually no legitimate business whatsoever and speculatively trading investor money in the commodities and futures markets. Bank of America should be held liable for its wrongful acts which aided and abetted the breaches of fiduciary duty committed against Plaintiffs and the Class members.

110.    The FCMs aided and abetted, encouraged, and rendered substantial assistance to these Defendants to wrongful acts complained of herein which breached their fiduciary duties. In aiding and abetting and substantially assisting the commission of the acts complained of, the FCMs acted with an awareness of Agape's wrongdoing

38

and realized that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein, including but not limited: (1) aiding and facilitating Cosmo who was barred from association with any investment broker-dealer to run an illegal unregistered commodities pool; (2) aiding and facilitating the looting of Agape through highly speculative commodities and futures trading which resulted in $80 million of losses; (3) breaching its "know your customer" obligations; (4) aiding and facilitating an unqualified "administrative assistant" to trade $100 million in the commodities and futures markets; (5) aiding and assisting Agape's Ponzi scheme by accepting deposits and wire transfers without verifying the source and propriety of the funds for trading. This conduct by the FCMs aided and abetted breached of fiduciary duties owed to Plaintiffs and the Class members.

111.    As a result of the wrongful conduct of Bank of America and the FCMs, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

## COUNT SIX
## NEGLIGENCE
## (All Defendants)

112.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein

113.    All Defendants owed Plaintiffs duties of ordinary and reasonable care which arise from their relationships with them and their position and status. Bank of America and the FCMs owe Plaintiffs and Class members duties of ordinary and reasonable care applicable to banks, financial institutions and futures commodities

39

merchants, as well as just and equitable principals of their respective trades. All Defendants breached their duties owing to Plaintiffs and Class members.

114.    The Agape Defendants breached their obligations to Plaintiffs and Class members by deceiving, misrepresenting, lying and materially omitting numerous facts or information about their backgrounds, business and operations, handling of investor money, and source and application by Agape of investor funds.

115.    Bank of America breached its obligations to Plaintiffs and Class members by these acts: Bank of America aided and abetted, encouraged, and rendered substantial assistance to these Defendants for wrongful acts complained of herein which breached their fiduciary duties. In aiding and abetting and substantially assisting the commission of the acts complained of, Bank of America acted with an awareness of Agape's wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein, including but not limited to: (1) Bank of America's assignment of more than one representative to work out of Cosmo's office which was approximately 28 miles from the branch where Agape and Cosmo had their bank accounts; (2) Bank of America provided its onsite representatives at Agape with on site bank equipment and/or computer systems and direct access to Bank of America's accounts and systems; and (3) Bank of America's onsite representatives at Agape had the ability to monitor and check account balances, accept deposits and issue checks; (4) contrary to industry standards and in violation of recognized compliance requirements, Bank of America allowed a convicted felon to control at least two dozen accounts, all under different names; (5) on a regular basis (perhaps as often as once an evening) Bank of America aggregated

funds totaling several millions of dollars and approved and effected transfers of the funds between and among various Agape bank accounts; (6) Bank of America failed to detect that Agape and Cosmo engaged in no legitimate business loans and were selling securities with required licenses or registration; (7) on a regular basis, Bank of America approved and effected transfers of up to $100 million dollars in wires to commodities and futures trading firms for speculative transactions which looted Agape's assets; (8) Bank of America failed to investigate the hundreds of millions of dollars of transferred funds and funds going into Agape's and Cosmo's accounts (and particularly given his criminal record and lack of legitimate business enterprise to support the account) despite compliance and legal requirements and its own policies and procedures for fraud detection.

116.    The FCMs breached their obligations to Plaintiffs and Class members by (1) aiding and facilitating Cosmo who was barred from association with any investment broker-dealer to run an illegal unregistered commodities pool; (2) aiding and facilitating the looting of Agape through highly speculative commodities and futures trading which resulted in $80 million of losses; (3) breaching its "know your customer" obligations; (4) aiding and facilitating an unqualified "administrative assistant" to trade $100 million in the commodities and futures markets; (5) aiding and assisting Agape's Ponzi scheme by accepting deposits and wire transfers without verifying the source and propriety of the funds for trading.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment in its favor:  For an order certifying the Class as defined herein.  For an order requiring disgorgement and restitution of

Defendants' ill-gotten gains and payment of restitution to Plaintiff and the Class all funds acquired by means of the fraudulent scheme complained of above. For compensatory, special and general damages according to proof but in an amount estimated to be not less than, and likely in excess of **$400 million**. For an order authorizing Plaintiff and the Class an equitable accounting. For reasonable attorneys' fees and costs of investigation and litigation under 18 U.S.C. §1964(c). For punitive damages in an amount sufficient to punish and deter future similar conduct; and For prejudgment interest; and For such other and further relief as the interests of law or equity may require.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

DATED:  March 26, 2009

**ZAMANSKY & ASSOCIATES LLC**

Jacob H. Zamansky (Bar No. JHZ 1999)
Edward H. Glenn, Jr. (Bar No. EHG 0042)
50 Broadway, 32nd Floor
New York, New York 10004
Tel:  (212) 742-1414
Facsimile: (212 742-1177


**CHAVEZ & GERTLER LLP**
Steven N. Berk (D.C. Bar No. 432-874)
1225 Fifteenth Street, NW
Washington, D.C. 20005
Tel:  (202) 232-7550
Facsimile: (202) 232-7556

**SEEGER & WEISS LLP**
Christopher Seeger
Stephen Weiss
Scott Alan George
One Williams Street
New York, New York 10004
Tel: (212) 584-0700

Attorneys for Plaintiffs

Exhibit A



AGAPE WORLD INC.
WE PROVIDE THE BRIDGE TO YOUR FUTURE.

HOME    INVESTOR INFORMATION    SOME OF OUR PREVIOUS LOANS    LOAN APPLICATION    CONTACT

| PREVIOUS LOANS | LOAN APPLICATION | INVESTOR INFORMATION | CONTACT COMPANY |
|---|---|---|---|

## WE PROVIDE THE BRIDGE TO YOUR FUTURE

Agape World Inc. is a **private bridge lender since 1999.** We do not provide residential mortgages. Call us if your commercial loan scenario does not meet the standards for institutional bank financing. Issues such as a time-sensitive transaction, poor credit, a non-cash flowing commercial property, or other hindering challenges may prohibit you from traditional financing. Agape World Inc. works with you and your potential project to help raise assets to meet approval for traditional lending at a later date.



**We arrange Equity Participations, Joint Ventures, Acquisition Loans, Bridge Loans, Construction Loans and Phase II/III financing for both income-producing and owner-occupied properties nationwide.** We also accept assignments for purchase orders from AA or AAA rated clients.

Asset liens must be placed in order to secure our private loan to you. At the same time you must show us that you are vigilantly securing traditional financing or mortgage.

We are not a mortgage company or regulated lending institution. We traditionally do not purchase real estate but have taken equity positions if we like the future of your project.

We have private sources of financing for bridge loans. Depending upon the borrower's time frame and the circumstances, interest-only loans as well as fixed-rate loans are available. Additionally, Agape World Inc. can provide financing at the time of acquisition, or years after an acquisition, in order to free trapped equity. These special situation loans can be placed instead of or alongside conventional financing to provide winning solutions where others may only see problems. Our firm can fund viable transactions of any size.

the
Click for Today's Mortgage Rates

**National Average Rates**

| 12-Feb-09 | | APR |
|---|---|---|
| 15 Yr FXD | ↓ | 5.07% |
| 30 Yr FXD | ↓ | 5.24% |
| 1 Yr ARM | ↓ | 3.98% |
| 3/1 Yr ARM | ↓ | 4.20% |
| 5/1 Yr ARM | ↓ | 4.38% |
| 7/1 Yr ARM | ↓ | 4.60% |
| 10/1 Yr ARM | ↓ | 5.04% |
| IO 3/1 Yr ARM | ↓ | 4.44% |
| IO 5/1 Yr ARM | ↓ | 4.55% |

**view charts & history**
**add to your site (free)**

source: infomars.com, erate.com
© theFinancials.com

© 2007 By Agape World Inc. All Rights Reserved.
Web Site and Data Engine Powered by Yerasoft.com.
This web site is database driven and all content is inserted by Agape World Inc.

Print View    Site Map    Login



**AGAPE WORLD INC.**
WE PROVIDE THE BRIDGE TO YOUR FUTURE.

HOME   **INVESTOR INFORMATION**   SOME OF OUR PREVIOUS LOANS   LOAN APPLICATION   CONTACT



**YOU ARE HERE** : HOME / INVESTOR INFORMATION

# INVESTOR INFORMATION



**Agape World Inc.** takes pride in our growing Approved Investor base and acts as an agent between the borrower and lender (you). *Our Approved Investors are referred exclusively by our brokers.* Agape World Inc. does not solicit investors. The funding process begins with due diligence of our borrowers and does not conclude until we are fully secure in our decision to take on the loan. All loans are secured by commercial asset liens equalling 100% of the loan for your investment's safety. With potential high returns that investors are grossing, it's no wonder Agape World Inc. has been noted by Dun and Bradstreet and is a proud member of the Chamber of Commerce. Investors nationwide have been satisfied for over 8 years and unlike other bridge loan companies, Agape World Inc. includes our investors in every deal funded!

**Our Approved Investors benefit from the model Agape World Inc. provides:**
* 99% security of your investment by first position UCC filing.
* Investors are in complete control of their funds and are able to access at any time.
* Each loan is collateralized by 100% commercial asset lien.
* 1099's are issued at the end of the year for interest accrued.
* Clients are consulted directly and personally with their executive every loan term.
*Loan terms range from 60 days to 18 months.

As our business grows, Approved Investors are always welcome to be a part of our fund raising through our brokers. With our solid business infrastructure and highly accredited name, Agape World Inc. is foreseeing a bright future. Project developers and contractors have sealed our services thru 2008 and into the future. We are projecting even more opportunities for borrowers and investors alike. Agape World Inc. provides the bridge to your future!

The material on this web site covers a variety of topics on commercial real estate mortgage banking and is for informational purposes only. This information is inherently limited in scope, may change without notice, and does not contain all of the applicable terms, conditions, limitations and exclusions of the products and services described herein. Interest payments are NOT guaranteed by Agape World Inc.



© 2007 By Agape World Inc. All Rights Reserved.
Web Site and Data Engine Powered by *Yerasoft.com*.
This web site is database driven and all content is inserted by Agape World Inc.

Print View   Site Map   Login

Exhibit B

RPD:GMC
F# 2008R01592

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    -against-

NICHOLAS COSMO,

            Defendant.

- - - - - - - - - - - - - - - - - -X

In the Matter of an Application
for Search Warrants for:

THE PREMISES KNOWN AND DESCRIBED
AS AGAPE WORLD, INC. AND AGAPE
MERCHANT ADVANCE, LLC, 150 MOTOR
PARKWAY, SUITE 106, HAUPPAUGE, NEW
YORK, A FOUR STORY BUILDING ON
MOTOR PARKWAY WITH THE NUMBERS 150
AFFIXED TO A SIGN OUTSIDE THE
BUILDING, AND GLASS DOORS AT
THE FRONT ENTRANCE OF THE BUILDING
AND SUITE 106 ON THE FIRST FLOOR,
WITH A GLASS DOOR ENTRANCE AND A
PLACARD AFFIXED ON THE RIGHT SIDE OF
THE GLASS DOOR STATING AGAPE WORLD
INC., AND A SIGN AGAPE WORLD INC.,
AFFIXED ABOVE THE RECEPTIONISTS DESK
ONCE INSIDE SUITE 106, AND VISIBLE
THROUGH THE FRONT GLASS DOORS

       and

THE PREMISES KNOWN AND DESCRIBED
AS AGAPE WORLD INC., AND AGAPE
MERCHANT ADVANCE, LLC, 64-13B GRAND
AVENUE, MASPETH, NEW YORK, A TWO STORY
ATTACHED BRICK BUILDING ON THE WEST
SIDE OF GRAND AVENUE, BETWEEN 64TH
STREET AND REMSEN PLACE, WITH A GLASS
DOOR ON THE FIRST FLOOR CONTAINING THE
WORDS AGAPE WORLD IN BLUE LETTERING,
AND A BLUE AWNING WITH WHITE LETTERING.

TO BE FILED UNDER SEAL

AFFIDAVIT IN SUPPORT OF
ARREST AND SEARCH WARRANTS

M. No. _____
(T. 18 U.S.C. § 1341)

# 09-0066M

WITH THE WORDS AGAPE WORLD AND
A COMPANY LOGO AND THE ADDRESS 64-13 B,
AND THE OFFICE IS LOCATED ON THE SECOND
FLOOR AND IS THE ONLY DOOR LOCATED AT
THE TOP OF THE STAIRWAY,

     and

THE PREMISES KNOWN AND DESCRIBED AS
AGAPE WORLD, INC., AND AGAPE MERCHANT
ADVANCE, LLC, 82-11 37TH AVENUE, SUITE
602, JACKSON HEIGHTS, NEW YORK, A NINE
STORY ATTACHED COMMERCIAL BUILDING ON
THE NORTH SIDE OF 37TH AVENUE BETWEEN
82ND STREET AND 83RD STREET, WITH THE
NUMBERS 82-11 AND WORDS A & C PALACE IN
GOLD LETTERING ABOVE FRONT ENTRANCE, AND
A GLASS DOOR AT THE ENTRANCE OF SUITE
602 ON THE SOUTHWEST SIDE OF THE 6TH
FLOOR WITH WHITE LETTERING ON THE GLASS
DOOR CONTAINING THE WORDS AGAPE WORLD
AND THE COMPANY LOGO.

- - - - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS.:

     RICHARD CINNAMO, being duly sworn, deposes and says

that he is a Postal Inspector with the United States Postal

Inspection Service ("USPIS"), duly appointed according to law and

acting as such.

     Upon information and belief, in or about and between

October 2003 and December 2008, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere,

the defendant NICHOLAS COSMO did knowingly and intentionally

devise a scheme and artifice to defraud, and to obtain money and

property by means of materially false and fraudulent pretenses,

representations and promises, and for the purpose of executing

such scheme and artifice, and attempting to do so, placed and
caused to be placed in post offices and authorized depositories
for mail matters, matters and things, to wit: envelopes containing
checks of purported interest payments, and deposited and caused to
be deposited such matters and things to be sent and delivered by
private and commercial interstate carriers.

(Title 18, United States Code, Section 1341).

Upon information and belief, there is probable cause to
believe that there is presently being kept and concealed within
THE PREMISES KNOWN AND DESCRIBED AS (1) AGAPE WORLD, INC. AND
AGAPE MERCHANT ADVANCE, LLC, 150 MOTOR PARKWAY, SUITE 106,
HAUPPAUGE, NEW YORK, A FOUR STORY BUILDING ON MOTOR PARKWAY WITH
THE NUMBERS 150 AFFIXED TO A SIGN OUTSIDE THE BUILDING, AND GLASS
DOORS AT THE FRONT ENTRANCE OF THE BUILDING AND SUITE 106 ON THE
FIRST FLOOR, WITH A GLASS DOOR ENTRANCE AND A PLACARD AFFIXED ON
THE RIGHT SIDE OF THE GLASS DOOR STATING AGAPE WORLD INC., AND A
SIGN AGAPE WORLD INC., AFFIXED ABOVE THE RECEPTIONISTS DESK ONCE
INSIDE SUITE 106, AND VISIBLE THROUGH THE FRONT GLASS DOORS
(hereinafter "SUBJECT PREMISES #1"), AND (2) THE PREMISES KNOWN
AND DESCRIBED AS AGAPE WORLD,INC., AND AGAPE MERCHANT ADVANCE,
LLC, 64-13B GRAND AVENUE, MASPETH, NEW YORK, A TWO STORY ATTACHED
BRICK BUILDING ON THE WEST SIDE OF GRAND AVENUE, BETWEEN 64th
STREET AND REMSEN PLACE, WITH A GLASS DOOR ON THE FIRST FLOOR
CONTAINING THE WORDS AGAPE WORLD IN BLUE LETTERING, AND A BLUE

3

AWNING WITH WHITE LETTERING WITH THE WORDS AGAPE WORLD AND A
COMPANY LOGO AND THE ADDRESS 64-13 B, AND THE OFFICE IS LOCATED ON
THE SECOND FLOOR AND IS THE ONLY DOOR LOCATED AT THE TOP OF THE
STAIRWAY (hereinafter "SUBJECT PREMISES #2"), AND (3) THE PREMISES
KNOWN AND DESCRIBED AS AGAPE WORLD, INC. AND AGAPE MERCHANT
ADVANCE, LLC, 82-11 37TH AVENUE, SUITE 602, JACKSON HEIGHTS, NEW
YORK, A NINE STORY ATTACHED COMMERCIAL BUILDING ON THE NORTH SIDE
OF 37TH AVENUE BETWEEN 82ND STREET AND 83RD STREET, WITH THE
NUMBERS 82-11 AND WORDS A & C PALACE IN GOLD LETTERING ABOVE FRONT
ENTRANCE, AND A GLASS DOOR AT THE ENTRANCE OF SUITE 602 ON THE
SOUTHWEST SIDE OF THE 6TH FLOOR WITH WHITE LETTERING ON THE GLASS
DOOR CONTAINING THE WORDS AGAPE WORLD AND THE COMPANY LOGO
(hereinafter "SUBJECT PREMISES #3"), (collectively the "SUBJECT
PREMISES"), certain property, to wit: (1) books and records,
including but not limited to, records of funds received, record of
funds disbursed, customer files, customer lists, commission
binders, mailing and shipping records, mailing devices, personnel
records, loan files, interest payment logs, cancelled envelopes,
pitch sheets, lead sheets, correspondence and inventory records;
(2) bank records and other financial institution records,
including but not limited to, bank statements, checks, deposit
slips, withdrawal slips and transfer slips, trading records,
employee records, payroll records, receipts, invoices, commission
payment records, financial statements; (3) other business records

4

including but not limited to records of incorporation, corporate
minutes, billing records, telephone records, emails, facsimiles,
promotional materials, loan contracts and other loan records, UCC
filing records, records of receipts, records of disbursement, tax
returns and supporting documentation, 1099's, W-2's, contracts
with other businesses or individuals, and records relating to
businesses or individuals and records relating to corporations
that AGAPE WORLD, INC. or AGAPE MERCHANT ADVANCE, LLC have either
sent or received funds; (4) safes, key-lock strong boxes,
suitcases, locked cabinets, concealed storage compartments, and
other types of locked, closed, and/or hidden containers that may
be used to store and secrete United States currency, books,
records, documents, financial instruments, and other items of the
sort to prevent the discovery of theft of such items; (5)
computers and related equipment, including but not limited to,
computer hard drives, zip drives, thumb or flash drives, laptop
computers, passwords, storage devices such as discs, CD ROM'S,
video tapes and audio tapes, CD's, DVD's and computer software;
(6) facsimile machines used to send or receive documents, which
may be analyzed to determine telephone numbers to and from which
documents have been sent and which may also be analyzed to
determine whether documents bearing certain fax lines were sent
from a particular machine, and any other devices or equipment
capable of storing data or text in any format, including but not

limited to cellular telephones, personal digital assistants, and any other storage media capable of containing data or text in magnetic, electronic, optical, digital, analog or any other format, used to store information described above; (7) records relating to mail or wire transfers directed to or from AGAPE WORLD, INC., AGAPE MERCHANT ADVANCE, LLC, and NICHOLAS COSMO; all of which property constitutes evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 1341.

The source of your deponent's information and grounds for his belief are as follows:[1]

1.   I have been a Postal Inspector with the USPIS for approximately 11 years and have participated in numerous investigations of violations of federal offenses committed using the United States mail and interstate carriers.  For the past six years, I have been assigned to units that primarily investigate offenses involving mail fraud, wire fraud or violations of the federal securities and commodities laws.  I am currently assigned to the Hicksville office of the USPIS.

I   **Introduction**

2.   For the last several months, I have been investigating two businesses, Agape World, Inc.("AGAPE"), and

---

[1]Because the purpose of this complaint is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

Agape Merchant Advance, LLC ("AMA") (collectively the "SUBJECT
COMPANIES"), as well as individuals associated with those
businesses. I have conducted this investigation with Special
Agents of the Federal Bureau of Investigation ("FBI"). I am
familiar with the information contained in this affidavit based,
among other things, on my own personal participation in the
investigation, my review of documents, participation in and review
of consensual recordings, conversations I have had with other law
enforcement agents and interviews of witnesses.

   3. As set forth below, this investigation has revealed
fraudulent activity involving the use of the U.S. Mail and private
interstate carriers. The investigation has further revealed that
the SUBJECT COMPANIES have been operated in a manner consistent
with what is commonly referred to as a "Ponzi scheme." A Ponzi
scheme is a fraudulent scheme in which investors are lured with
promises of unusually high returns purportedly generated by
profitable business ventures. However, in such a scheme, the vast
majority of the money raised is actually obtained from the
investors themselves, rather than from genuine business ventures
and, thus, the scheme ultimately becomes unsustainable as the
returns promised to current investors gradually exceed the revenue
provided by new investors. Early investors in a Ponzi scheme
often receive the promised returns and, sometimes, their initial
investment. The apparent success of the investments is used to

encourage re-investment and to recruit new investors.    Later
investors are typically left with nothing when the scheme
ultimately collapses.

4.    As it relates to this investigation, one or more
individuals associated with the SUBJECT COMPANIES engaged in, and
continue to engage in, a scheme to defraud individual investors by
means of materially false and fraudulent representations,
specifically: (1) by falsely telling investors that AGAPE provides
short-term bridge loans to commercial borrowers generating high
interest returns, that their investment money would be used solely
to fund such bridge loans, and that their returns would be derived
from interest paid by the commercial borrowers; and (2) by falsely
telling investors that AMA provides loans to merchants secured by
merchants' future credit card receipts, that their investment
money would be used solely to fund such loans, and that their
returns would be derived from interest paid by the merchant
borrowers.    During the course of the investigation, we have
determined that the investors' money has not been used solely to
fund such loans and that little of the investors' money has
actually been forwarded to commercial borrowers as loans.
Furthermore, the investigation has revealed that much of the money
paid back to investors thus far was actually money provided by
subsequent investors, rather than interest payments provided to
the SUBJECT COMPANIES by commercial borrowers.

8

5.   As further discussed below, bank records reveal that, from January 1, 2006 until November 30, 2008. more than $370 million was deposited into the bank accounts of the SUBJECT COMPANIES. A review of records indicates that the vast majority of that money came from more than 1500 individual investors and not from commercial entities that may have been repaying loans. The records further indicate that less than $10 million of the $370 million was forwarded to borrowers as interest-generating loans.  As of January 22, 2009, there is approximately $746,000 in the bank accounts of the SUBJECT COMPANIES.

6.   Furthermore, bank and trading records reveal that, during a five-year period from 2003 through 2008, more than $100 million was transferred from the SUBJECT COMPANIES to certain commodities futures trading accounts controlled by the defendant NICHOLAS COSMO.  Approximately $80 million of that $100 million was subsequently lost in commodities trading, with approximately $20 million returned to the SUBJECT COMPANIES.  I and other investigators assigned to the USPIS and FBI have interviewed individuals who invested money in the SUBJECT COMPANIES.  None of the information developed in the course of this investigation indicates that any investors were advised that their money would be used for commodities trading.

II      **The Defendant and his Companies**

    **A.   The Defendant NICHOLAS COSMO**

    7.    The defendant NICHOLAS COSMO is the owner of both
AGAPE and AMA.   COSMO's criminal history includes a federal
conviction for mail fraud.   On December 30, 1997 he was arrested
by the Federal Bureau of Investigation in the Eastern District of
New York on a complaint charging him with mail fraud relating to
an investment scheme.   In a handwritten statement prior to his
1997 arrest, the defendant COSMO, then a licensed stock broker and
account executive, admitted to commingling funds, purposely
misleading investors, and forging documents.   The defendant COSMO
subsequently pleaded guilty and was sentenced on January 15, 1999
to a prison term of 21 months followed by three years of
supervised release and ordered to pay restitution of $177,000 plus
interest by United States District Court Judge Arthur D. Spatt.
The defendant COSMO was on supervised release from August 2000
through August 2003.   During the three-year supervised release
period, the defendant COSMO made restitution payments totaling
approximately $11,000.   In connection with his supervised release
the Court also ordered the defendant COSMO to participate in
intensive outpatient gambling therapy and submit full financial
disclosure, which included monthly reporting of his income and the
sources of his income.[2]   Furthermore, according to the National

---

[2] An investigator with the U.S. Attorney's Office, has spoken to
the United States Probation Officer who supervised the defendant

Association of Securities Dealers ("NASD"),  COSMO´s brokers'
license was revoked in 2000 due to his 1999 conviction.  According
to the NASD, COSMO was censured, fined $68,209 and barred from
association with any NASD members in any capacity.  According to
NASD records, COSMO consented to the described sanctions and to
the entry of the finding that, in sum and substance, he falsified
account transfer records to gain control of a customers' account.

**B.    Subject Company: AGAPE**

8.    AGAPE is a New York State corporation incorporated
in August 2000.  However, according to the AGAPE website, AGAPE
has been a  bridge loan lender since 1999.  AGAPE maintains
offices at 150 Motor Parkway, Suite 106, Hauppauge, New York, 64-
13B Grand Avenue, Maspeth, New York, and 82-11 37TH Avenue, Suite
602, Jackson Heights, New York.

9.    Since at least 2004, AGAPE has been accepting money
from investors purporting to loan that money commercial borrowers
in the form of bridge loans.  In its promotional material
displayed on its website, AGAPE states the following:

> *Agape World Inc. is a private bridge lender*
> *since 1999.  We do not provide residential*
> *mortgages. . . .  We have private sources of*

---

COSMO.  With regard to the financial disclosure, the Probation
Officer informed him that the defendant COSMO reported, through
the period of October 2000 to August 2003, that his mother owned
AGAPE and that is was an internet company that did advertising in
connection with used car sales.  He stated that he was a sales
representative, that companies paid a flat yearly fee for
advertising and that there were no commissions involved in his
work.

> financing for bridge loans.  Depending upon
> the borrower's time frame and the
> circumstances, interest-only loans as well as
> fixed-rate loans are available. Additionally,
> Agape World Inc. can provide financing at the
> time of acquisition, or years after an
> acquisition, in order to free trapped equity.
> These special situation loans can be placed
> instead of or alongside conventional financing
> to provide winning solutions where others may
> only see problems.  Our firm can fund viable
> transactions of any size.

A link on the AGAPE homepage labeled, "Investor Information" leads

to a page on which the following statement appears:

> As our business grows, Approved Investors are
> always welcome to be a  part of  our fund
> raising through our brokers.  With our solid
> business  infrastructure and highly accredited
> name, Agape World Inc. is foreseeing a bright
> future.  Project developers and contractors
> have sealed our  services thru 2008 and into
> the future.  We are projecting even more
> opportunities for borrowers and investors
> alike.  Agape World Inc. provides  the bridge
> to your future!

The website also makes certain claims regarding the rights and

benefits to be enjoyed by investors in AGAPE including, but not

limited to, the following: "(1) 99% security of your investment by

first position UCC filing, (2) Investors are in complete control

of their funds and are able to access at any time, and (3) Each

loan is collateralized by 100% commercial asset lien."

### C.    Subject Company: AMA

10.    AMA is a New York State corporation incorporated

in November 2007.  Since at least that time, AMA has held itself

12

out to be a lender to commercial entities that accept credit cards and has accepted money from investors purporting to loan that money to customers of AMA. According to the AMA website, such advances are "typically taken out against a merchant's future credit card sales." AMA maintains offices at 150 Motor Parkway, Suite 106, Hauppauge, New York, 64-13B Grand Avenue, Maspeth, New York and 82-11 37TH Avenue, Suite 602, Jackson Heights, New York.

### D.    The SUBJECT COMPANIES's Bank Accounts

11.    Based on my review of bank records in this case, COSMO has caused 13 separate bank accounts to be opened at Bank of America in the name of AGAPE and another 13 bank accounts to be opened at Bank of America in the name of AMA. One of the 13 accounts in the name of AGAPE has clearly been identified as the AGAPE operating account ("AGAPE Main Account") while the remaining 12 accounts can be described as subsidiary accounts. Similarly, one of the 13 accounts in the name of AMA has clearly been identified as the AMA operating account ("AMA Main Account") while the remaining 12 accounts can be described as subsidiary accounts. As a matter of practice, at the end of each business day, COSMO causes the balances in all of the 12 AGAPE subsidiary accounts to be transferred to the AGAPE Main Account. Similarly, at the end of each business day, the balances in all of the 12 AMA subsidiary accounts are transferred to the AMA Main Account.

13

12.   Based on my review of bank records, there does not appear to be a systematic pattern of transfers between the AGAPE Main Account and the AMA Main Account.[3]   In fact, based on the interviews I have conducted of investors, witnesses, and employees of the SUBJECT COMPANIES, these two businesses are independent of one another and I have learned of no valid reason why investor funds would be transferred between the AGAPE Main Account and the AMA Main Account.   Investor funds that are deposited into the AGAPE Main account are supposed to be for a specific bridge loan recipient.   Similarly, investor funds that are deposited into the AMA Main account are supposed to be advanced to a consortium of merchants.

### E.   The Investment Brokers

13.   The defendant NICHOLAS COSMO has numerous brokers or recruiters who work for both AGAPE and AMA.   These brokers are referred to as "account representatives" and they assist COSMO by finding investors for both companies.   Some of the brokers work as team leaders and have sub-brokers who work for them.   Through a review of records and discussions with witnesses, I have identified at least ten account representatives who have solicited individuals to invest in the SUBJECT COMPANIES.   Analysis of bank records related to this case reveals that a number of the account

---

[3] A review of bank records of both AGAPE and AMA reveal that there are periodic transfers of money from AMA to AGAPE although there appears to be no legitimate business reason for these transfers.

representatives have received substantial payments from the
SUBJECT COMPANIES.  Records reveal that, in total, more than $55
million has been paid to the account representatives during the
course of the scheme.  Through personal experience investigating
investment schemes and through discussions with other federal
investigators with experience investigating investment schemes, I
have learned that the leaders of such schemes often offer and pay
large percentages of customer investments to the brokers who
recruit the investors.  Furthermore, I have learned that the
amounts of these payments are often not disclosed to the
investors.

14.  Representative one ("R-1") has worked for AGAPE or
AMA since about March 2005.  R-1 is one of the top earning
representatives in the company and he has several sub-
representatives who work on his team.  According to a review of
bank records, from in or about March 2005 to November 2008, R-1
has received approximately $15,225,000 in payments from AGAPE and
AMA.  The majority share of this amount, $14,600,000 was received
between January 2007 and October 2008, when it was transferred
from both the AGAPE and AMA bank accounts at Bank of America to
his personal account, which translates into average monthly
payments of approximately $660,000 for that time period.

15.  Representative two ("R-2") has worked for AGAPE or
AMA since early 2006.  R-2 is one of the top earning

15

representatives in the company.  According to the analysis of bank records in the time period of June 2005 to October 2008, R-2 has received more than $12.1 million collectively in payments from AGAPE or AMA bank accounts.

16.  Representative three ("R-3") has worked for AGAPE and AMA since at least April 2005.  R-3 is the brother of R-2. According to the analysis of bank records, from April 2005 to October 2008, R-3 has received in excess of $4.6 million from AGAPE and/or AMA.

17.  Representative four ("R-4") has worked for AGAPE or AMA since at least April 2004.  Currently, he works out of the Jackson Heights, New York office.  According to a review of bank records, R-4 has received in excess of $8.7 million between April 2004 and November 2008 from AGAPE or AMA.  R-4 has a prior criminal history that includes a state conviction for Robbery. Specifically, R-4 was arrested on January 7, 1990 and charged with Robbery in the First Degree.  In September 1990, he was convicted after trial in Queens Supreme Court of Robbery in the Second Degree, a Class D violent felony and sentenced to an indeterminate term of imprisonment of two-six years.

18.  Representative five ("R-5") has worked for AGAPE and/or AMA since in or about December 2007.  According to an analysis of bank records, R-5 has earned $100,000 during the time period of December 2007 to September 2008.  R-5's criminal history

16

includes a state conviction for Attempted Grand Larceny.
Specifically, in November 1992, he was arrested for the crime of
Attempted Robbery in the Second Degree, and in September 1993 he
was convicted of Attempted Grand Larceny in the Third Degree and
sentenced to five years' probation.

19.    Representative six ("R-6") has worked for AGAPE or
AMA since in or about September 2006.  R-6 is a sub account
representative of R-1.  Analysis of bank records reveal that in or
about and between September 2006 and August 2008, R-6 received in
excess of $2.9 million  from R-1.  In addition, bank records
reveal that between January 2007 and October 2008, R-6 also
received $300,000 directly from AGAPE.

20.    Representative seven ("R-7") has worked for AGAPE
or AMA since in or about September 2006.  R-7 is a sub account
representative of R-1.  Analysis of bank records show that between
September 2006 and August 2008, R-7 received in excess of $430,000
from R-1.

21.    Representative eight ("R-8") has worked for AGAPE
or AMA since September 2005.  He and his wife own a company
(Company # 1) whose corporate business address is 150 Motor
Parkway, Suite 106, Hauppauge New York.  An analysis of bank
records reveals that, from September 2005 to October 2008, Company
# 1 received in excess of $5 million from both AGAPE and AMA

17

business accounts.[4]  In addition, R-8 has received checks totaling

$11,300 in both December 2006 and December 2007 from AGAPE.  The

memo on the face of the check reads "Bonus."  R-8's criminal

history includes a federal conviction for heroin importation.

Specifically, R-8 was arrested on October 2, 1997 and charged with

importation of heroin and possession of heroin with intent to

distribute.  On November 24, 1997, R-8 was convicted in the United

States District Court, Southern District of Florida, of heroin

importation.  On March 4, 1998 he was sentenced to 57 months'

imprisonment to be followed by three years of supervised release.

According to U.S. Bureau of Prisons Records, R-8 was incarcerated

at Allenwood F.C.I. from April 1998 to June 2001.  COSMO was also

incarcerated at Allenwood F.C.I. from January 1999 to August 2000.


    22.  Representative nine ("R-9") has worked for AGAPE or

AMA since in or about August 2006.  R-9 is a sub account

representative of R-1.  R-9 owns a company (Company # 2).

Analysis of bank records reveals that, in or about and between

August 2006 to November 2008, R-9 received in excess of $4.2

million from AGAPE to both his business and personal accounts.  In

addition, bank records reveal that, in October 2006 and August

---

[4] According to the records of the U.S. Bankruptcy Court, the wife
of R-8 filed for Chapter 7 bankruptcy in June 2002 and her debts
were discharged in September 2002.  R-8 filed for Chapter 7
Bankruptcy in December 2004 and his debts were discharged in May
2005.

2008, R-9 received checks totaling $35,000 from R-1, and that
Company #2 received $660,000 from R-1 between December 2006 to
August 2008.

23.    Representative ten ("R-10") has worked for AGAPE or
AMA since in or about April 2004.  R-10 is a sub account
representative for his brother R-4 and shares office space with
him at the Jackson Heights, New York office.  Analysis of bank
records reveals that, in or about and between April 2004 and
October 2008, R-10 received in excess of $1.5 million from AGAPE
and AMA to both his business and personal accounts.[5]

III.    **The Scheme to Defraud**

24.    I have learned that the defendant NICHOLAS COSMO
and his account representatives solicited more than 1500
individuals to invest in the SUBJECT COMPANIES promising
annualized rates of return as high as forty-eight to eighty
percent.  Investors were solicited primarily through referrals
from other investors and were contacted by telephone or e-mail.
According to investors who have been interviewed, COSMO and his
account representatives told investors that background research
was conducted on the prospective borrowers to whom loans would be
made.  As part of the scheme, the defendant and his account
representatives often had investors mail checks to the SUBJECT

---

[5] Approximately $20,000 went into his personal account while the
remainder was deposited into his company account.  In January
2008, R-10 received a check in the amount of $6,000 from AGAPE
and the memo on the face of the check indicated "Bonus".

19

COMPANIES via the U.S. Mail.  In addition, the defendant mailed or caused to be mailed interest payments to the investors via U.S. Mail.

25.  Through interviews with investors, I have learned that COSMO and/or his account representatives soliciting investments in AGAPE informed potential investors that AGAPE was a bridge loan lender that made secured loans to commercial entities, usually for a period between 36 and 70 days, at rates of interest between 6 percent and 16 percent, respectively.  In addition investors were told that their entire investment would go toward the funding of a specific bridge loan and that they would receive all the interest.

26.  Through interviews with investors, I have learned that COSMO and/or his account representatives soliciting investments in AMA informed potential investors that AMA provided loans to merchants secured by the merchants' future credit card sales.  Furthermore, the investors were told that their investment principal was locked in for a period of one or two years and would pay interest of 4 percent each month (an annualized rate of 48 percent).

27.  Bank records reveal that, from January 1, 2006 until November 30, 2008, more than $370 million was deposited into the bank accounts of the SUBJECT COMPANIES.  A review of records indicates that the vast majority of that money came from more than

20

1500 individual investors and not from commercial entities that
may have been repaying loans.  A review of records indicates that
less than $10 million of the $370 million was forwarded to
borrowers as interest-generating loans.  According to a
representative of Bank of America, as of January 22, 2009, the
current balance in the AGAPE main operating account was
approximately $439,000 and the current balance in the AMA main
operating account was approximately $307,000.

28.  A summary of one loan that AGAPE did make to an
actual commercial entity illustrates that AGAPE's business model
is incapable of supporting the exorbitant returns promised to
investors by COSMO and/or his account representatives due to the
rates of interest being paid by the supposed or actual borrowers.
On May 23, 2008, AGAPE provided a bridge loan to Company A[6] in the
amount of $500,000 at an interest rate of 15% per year plus four
points payable at closing.  On September 2, 2008, Company A
obtained financing from a financial institution and repaid its
loan from AGAPE in full.  Based upon my review of the loan
agreement and bank records, AGAPE earned less than $45,000
interest on its loan to Company A.  Thus, the total amount
returned to AGAPE on this loan was less than $545 000.  However,
AGAPE bank records for the period July 3, 2008 to August 22, 2008
revealed that AGAPE made payments to more than 100 investors

---

[6]The name of the company is known to the government.

and/or representatives totaling more that $5.2 million purportedly generated by the bridge loan made to Company A. All of those payments were in the form of checks drawn against the AGAPE main account, and each check was memorialized with the name of Company A in the memo section. It is clear from this example that, in fact, the payments to these investors did not come from interest generated by the loan to Company A. A further review of bank accounts revealed that approximately $4.7 million of the $5.2 million actually came from subsequent investors in AGAPE.

IV.    **The Undercover Investigation**

29. During the course of the investigation, I posed as both an investor and a borrower at different times. In those roles, I communicated with several employees of both companies, including R-2. In addition, I also communicated via e-mail and by telephone with an individual who I knew had become an AGAPE investor.

30. In October 2008, I contacted AGAPE's office in Hauppauge on several occasions posing as a businessman seeking a $4.5 million bridge loan. I communicated, via e-mail and telephone, with an employee ("Employee #1") who identified herself as a Contract Administrator in the loan origination department. Employee #1 e-mailed me a two-page application and a document on AGAPE letterhead titled "Rate & Terms (4/2008)." The first three bullets on this document read: 12 to 14 percent rate; 2 to 4

22

points; and 12 to 18 month term. On October 14, 2008, I recorded

a telephone conversation with Employee #1. In discussing the

application, I had the following exchange with Employee #1

regarding the interest rates of the loan I was trying to obtain:

| | |
|---|---|
| UC: | And that's confirmed at 18 percent if it's, if it's approved. 18 percent for the year. So, you explained you pull the fees out up front. |
| EE #1: | Yeah. |
| UC: | But is that right, it's 18 percent for the year? |
| EE #1: | It would be, well...what . . . you're looking to borrow the money for a year? |
| UC: | Yes. |
| EE #1: | So, it would be, on the, on the highest end it would be 16 percent and 6 points. |
| UC: | Alright. So on the highest end 22 percent[7] for the year. |
| EE #1: | Yes. |

In another part of the same conversation I started discussing

information I had seen on the AGAPE website regarding the

investors of the company and how they received much higher rates

of return than what AGAPE was receiving as interest from the

borrowers. I had the following exchange with Employee # 1:

| | |
|---|---|
| UC: | But they're saying (AGAPE) investors are getting like 50% or thereabout. |
| EE #1: | No. I understand where that came from though. It's a, it's a misconception. They're ... anybody who invests with us, uh, can make anywhere from 8 to 12 percent on their money. |
| UC: | Over what period of time? |

---

[7] This interest rate is far below the percentage returns
typically promised to AGAPE investors.

23

| | |
|---|---|
| EE #1: | Over 3 to 4 months. |
| UC: | All right. But doesn't that...what's...do the math. |
| EE #1: | Yes. What they're saying is they're making approximately 50 percent a year... which, if you were to roll over your money in, through each contract that we have available, that would be true. |

31.    In September 2008, a purported investor (the "Investor") contacted a number of individuals via e-mail to describe his investment in AGAPE and to encourage others to invest in AGAPE. One of those individuals forwarded the e-mail to me. Later, I also received the e-mail directly from the Investor. The Investor reported that he began investing in AGAPE in 2005. He stated that he was offering the opportunity to invest to others because of the "large sum of money" that he had made on his investments with AGAPE. The e-mail, which identified AGAPE as a commercial bridge loan lender and the defendant COSMO as the President of AGAPE, described the rates of return given to the Investor and his family members from AGAPE investments. The Investor stated that, over the past three-year period, AGAPE had provided him, his family and friends with an interest rate of 14 percent. The length of the time period for the loans had been from 30 to 77 days, and those terms yielded an interest return of approximately 56 percent per year. The Investor then encouraged the e-mail recipients to invest in AMA and touted the AMA investment as the "newest business affiliate of AGAPE" that was providing "financial solutions to merchants." He stated that an

investor could make 4 percent per month for a period of 12 months
and have an investment return of 48 percent per year. He touted
AMA as providing an alternative to traditional loans for merchants
nationwide. The Investor stated that this investment has become
popular because investors are able to receive regular monthly
dividend checks of 4 percent interest on their money every 30
days.

32.   After receiving this information from the Investor,
I contacted him and expressed interest in investing in AGAPE. We
subsequently exchanged several e-mail messages and spoke via
telephone regarding AGAPE, AMA, COSMO and his representatives.[8]
Representations regarding the returns of 48 percent or more were
repeated several times in the e-mail correspondence and on the
telephone during the months of September through November 2008.

33.   During a recorded telephone conversation with
the Investor on October 30, 2008, I asked specific questions
regarding the business model of AMA. There, the Investor informed
me that he has learned that there are 50 merchants in the program
and that investor money is being loaned to this "conglomerate" by
AMA. The Investor further stated that he was gradually switching
his investments from AGAPE to AMA because he found AMA to be more

---

[8] During the course of this correspondence, the Investor told me
that he has two nephews who work as representatives or brokers
for AGAPE, and that he and other family members have been
investing since 2005.

lucrative given his observation that the AGAPE contracts were now running longer than they had in prior years.

34. During that same conversation, I asked the Investor if he receives interest payments monthly. He stated that he had received regular monthly payments but then also mentioned an outstanding AGAPE bridge loan that was overdue and that had its maturity date extended until December 2008.[9] The Investor stated that he learned from his nephew (R-2)[10], that the borrower, "Carriage House" was the only borrower within the last five years to have failed to repay AGAPE on time. The Investor further stated that he expects the borrower to repay the loan, with interest, in December 2008. When I asked the Investor for the amount of the delayed loan, he stated that he did not know. He

---

[9] Prior to this conversation with the Investor, I obtained a copy of a September 22, 2008 letter COSMO mailed to investors stating that the borrower was unable to secure traditional financing on the maturity date and, as a result, the bridge loan and interest due would not be paid on the September 29th as originally stated. The letter further stated that the loan would be extended for an additional 90 days and that all investors contracts would be extended until December 29, 2008. In addition, it stated that no refund requests would be permitted during the extension period. I also went on a website blog entitled "ScamVictimsUnited.com" and saw multiple entries regarding AGAPE and discussions regarding the fact that a borrower of a bridge loan had not made payment to AGAPE in a timely fashion and that, as a result, interest payments would be delayed.

[10] The Investor stated that one nephew (R-2) had been a broker for five years and that another nephew (R-3) began working more recently as a broker. According to the Investor, R-2 used to work as a mailman but quit because he was making a lot more money working for AGAPE. The Investor went on the say that the former mailman was now living in a $2.5 million house.

26

did say that since he has been investing for the past three and a
half years, that was the first time this has happened.  The
Investor told me that he was waiting for pamphlets to arrive in
the mail detailing a new insurance program AGAPE was promoting to
make its investors feel more secure because the investments are
only 99 percent secure.

    35.  I also talked to other investors about their
investments, how they became involved with AGAPE or AMA, and what
representations had been made to them.  The day after I began
talking to other investors, R-2 contacted me through his uncle,
the Investor.  On November 5, 2008, I had a lengthy telephone
conversation with R-2.  R-2 stated that some investors were not
presently getting paid because there was a loan that was overdue.
R-2 asked why I was talking to investors and asked me to stop
because he was afraid they would get nervous.  I told him I was
interested in investing and he told me that he thought I was doing
an investigation.[11]  At some point in the conversation he
discouraged me from investing by saying:

> R-2:      Now isn't a good time.  Not that
> it's a scam or anything.  It's just
> that I had a deal that was on
> extension.  So I was a little -- I
> don't own the company.  I'm a
> broker.  There's 50 brokers, you
> know.  What we do is refer people in
> basically.

---

[11] Although I was posing as a potential investor, R-2 was aware
that I am employed by the USPIS.

UC:        You said there are 50 brokers.
               Where are they, are they all over
               the country?

R-2:       I don't know ... cause there are
               sub-brokers and brokers.  There's I
               guess ... seven ... there's maybe
               four or five that work out of
               Hauppauge.  A lot of people work out
               of their houses.  Basically, brokers
               are people who refer people in.

Later in the conversation, R-2 questioned whether I thought it was

a fraud:

R-2:       If it's a scam then the scam's been
               going on for how many years now? I
               don't know -- Nick Cosmo is the
               boss.  All I do I refer people in
               ... but if there's a scam then it's
               been going on for eight years and
               everybody's been getting paid.  So
               you know, you gotta give this guy a
               little bit of a break.  I don't
               think he ever scammed anybody as far
               as I know ... supposedly the company
               has been around for the last nine
               years ... if you look at when he
               was, uh, look at the history of the
               company, from what I understand,
               it's been around for nine years.  I
               only know him for the last four.

When discussing the investors R-2 stated:

R-2:       We don't have -- our clients aren't
               all -- you know, Fortune 500
               business guys that are investing
               with us.  They're average people.
               If they find -- you know, if they
               feel like something's going on like,
               you know, we're being investigated,
               or there's a scam, plus they are
               gonna pull their money out which
               will start a run off....  You can
               ruin a company if you start flashing
               your badge to people.  Because you

28

got regular people putting in their
life -- putting in money and you,
you basically - they don't (know)
anything, just like me. You start
showing badges and they say, oh no,
what's going on. You know, let me
pull my money out. Okay, I want my
money back. While the deal is going
on, he's gonna say -- well, I want
my money back. The next person, I
want my money back, it's a scam. I
understand what you are saying that
you're trying to look out for
everyone's best interests, but I
don't believe you went there trying
to invest money 'cause if you did,
you could've just sat down with the
rep, or with Nick Cosmo himself.

He further stated about their client base:

R-2:    We don't solicit. So if anybody is
        a client, it's a friend of a friend
        or this person knows this person.
        So the person whose door you knocked
        on, there's probably five or six
        people that - - are in the company
        who is - -they're related or they're
        friends with.

UC:     What do you got on the table? You
        said you got everybody in your
        family in it. If you add up
        everything in your family, what do
        you got, millions in there?

R-2:    Yeah, yeah.

UC:     How about you? You got millions
        yourself in there?

R-2:    Not millions but a substantial
        amount of money.

29

V.    **The Commodities Futures Trading Accounts**

36.    Bank and trading records reveal that the defendant COSMO maintained trading accounts with at least seven different commodities futures trading firms between October 2003 and October 2008.  Bank and trading records further reveal that COSMO transferred more than $100 million from the AGAPE Main Account to the commodities futures trading accounts during that time.  Further analysis determined that the defendant COSMO incurred combined trading losses totaling more than $80 million during that time period, with approximately $20 million returned to the SUBJECT COMPANIES.  According to the records of those seven trading accounts, only one account remains open and that account has a balance of approximately $2,000 as of January 22, 2009.

37.    COSMO opened one of the trading accounts at MF Global, a futures trading firm located in Chicago, Illinois.[12] COSMO opened the MF Global account in March 2008 in the name of AGAPE and signed the account opening documents as "President" of AGAPE.  Furthermore, in a document he signed when he opened the MF Global Account, COSMO affirmed that *All funds deposited in the trading account represent proprietary funds of the Corporation and do not represent the interests of any other individuals or companies.*"  COSMO signed similar declarations when he opened four of the other trading accounts.

---

[12] COSMO is the only individual with signature power on the account.

30

38.  Bank and trading records reveal that, between March 2008 and September 2008, COSMO transferred more than $17 million from the AMA Main Account to the AGAPE Main Account.  During that same period of time, COSMO transferred more than $27 million from the AGAPE Main Account to the MF Global Account, typically on or around the same day that money was transferred from the AMA Main Account to the AGAPE Main Account.

39.  Further analysis of COSMO's trading records at MF Global indicates that, between March 2008 and September 2008, he suffered trading losses totaling in excess of $21 million.  During that time period, all of the deposits into the MF Global Account came from the AGAPE Main Account, which had been partially funded by transfers from the AMA Main Account.

40.  Furthermore, in October 2008, COSMO attempted to open a futures trading account at Dorman Trading, located in Chicago, IL.  Analysis of bank records revealed that COSMO wired $1 million from the AGAPE Main Account to Dorman on October 10, 2008.  However, Dorman sent the wire transfer back to the bank because the source of the funds (AGAPE) did not match the named account holder (Nicholas Cosmo) for the futures trading account.  According to Dorman Trading, no account was ever funded or traded due to this discrepancy.

31

VI. **Other Expenditures**

41. According to bank records detailing debit card purchases made by COSMO from January 2005 to October 2008, more than $100,000 in investor funds were used to pay for what appear to be personal expenses such as jewelry store purchases, hotel room rentals on Long Island and limousine fares. Furthermore, from January 2006 to February 2008, COSMO wrote checks totaling $95,000 from the AGAPE bank account to his wife.

42. Bank records also reveal that COSMO used $212,788 of investor funds to satisfy an outstanding restitution obligation related to his previous mail fraud conviction.[13] After having paid only $11,000 over his three-year supervised release period from 2000 to 2003, on October 15, 2007, COSMO made a lump sum payment of $212,788 in the form of a cashier's check derived from an AGAPE bank account. Additionally, bank records indicate that COSMO used more than $300,000 from the SUBJECT COMPANIES to purchase capital improvements and to fund operating expenses for a private travel baseball league in Seaford, New York which COSMO is reportedly the President of.[14]

---

[13] This figure included both the principal and interest on that restitution figure.

[14] The name of the baseball league is the National Tournament Baseball ("NTB"). On the official NTB website, it lists COSMO as the President of the league. In addition, the address of NTB is listed as 150 Motor Parkway, Suite 106 Hauppauge, New York which is also the address for AGAPE. There is also a sign at the field in Seaford, New York that states the league is sponsored by AGAPE.

## VII. <u>A Sample of Investors: June 30, 2008 - July 1, 2008</u>

43.   I have spoken with at least eight individuals
(Jane Doe # 1 and John Doe #1 through John Doe #7") who invested
in AMA during June and July 2008.[15]   Most of those investors
informed me that they had also invested in AGAPE on prior
occasions.   All of those investors informed me that, prior to
making their initial investment in AGAPE or AMA, they knew one or
more individuals who had already invested.   All of those investors
further informed me that representations were made to them by the
defendant NICHOLAS COSMO and/or one of his account representatives
that their investment in AGAPE would be used to fund specific
bridge loans and that their investment in AMA would be advanced to
a consortium of merchants registered by AMA.   All of the investors
reported that, for the AGAPE investments they were to receive the
interest rate specified for that particular loan while, for their
AMA investment, they were told that they would be earning 4%
interest per month, or 48 percent per year, and that their money
would be locked in at that rate for either a one or two year
period.   Additionally, all of these victims told me that they
relied on the representations made to them by COSMO and/or his
account representatives when making the decision to invest.   Each

---

[15] Although I have identified and interviewed numerous other
victims, for the purposes of this Complaint, I am focusing on
eight victims who invested with AMA over a two-day period to
provide an example of the way these companies conduct business
and the representations made to the investors.

33

of the investors reported that they would not have invested had they known that their money would be used for other purposes.

**Jane Doe #1**

44.    Jane Doe #1 ("JaD #1"), an individual who resides in Nassau County, invested $10,000 in AMA on June 30, 2008. During an interview on November 6, 2008, JaD #1 reported that she had previously invested approximately $50,000 in either AMA or AGAPE.  JaD #1 invested in AMA through R-6.

**John Doe #1**

45.    John Doe #1 ("JD #1"), an individual who resides in Westchester County, invested $216,000 in AMA on June 30, 2008. During an interview on November 6, 2008, JD #1 reported that he had previously invested approximately $170,000 in either AMA or AGAPE.  JD #1 invested in AMA through R-3.  JD #1 reported that, in addition to speaking to R-3 before investing his money, JD #1 had spoken to and has met with the defendant NICHOLAS COSMO about this investment.  Pursuant to those conversation, JD #1 made large investments in AMA.  JD #1 stated that he receives monthly interest payments on a regular basis but that recent interest payments were received late.

**John Doe # 2**

46.    John Doe #2 ("JD #2"), an individual who resides in Westchester County, invested $50,000 in AMA on June 30, 2008. During an interview on November 5, 2008, JD #2 reported that he

had previously invested a substantial amount of money in either
AMA or AGAPE but JD #2 would not disclose the specific amount of
money that was invested.  JD #2 invested in AMA through R-3.  In
addition to speaking to R-3 about his investments, JD #2 also
spoke directly to COSMO who reiterated the terms and conditions in
a series of face-to-face meetings, at least one of which took
place at the AGAPE office in Hauppauge.  Based upon the
representations made to JD #2 by R-3 and by COSMO, JD #2 believed
his investments in AGAPE and AMA was going to be used solely as
stated above.  According to JD #2, COSMO told JD #2 that his
investment was 99 percent risk free.  COSMO assured JD #2 that
AGAPE was placed on the "title" of the company to whom the money
was being loaned.  In the event of a default, which COSMO assured
JD #2 occurred only 3 percent of the time, AGAPE would become a
part-owner of the borrowing entity.  COSMO also told JD #2 that
AGAPE'S loans represented approximately 40-50 percent of the value
of the borrowing entity's assets, meaning that AGAPE investors
were further protected in case of a default.  JD #2 reported that
when his AGAPE investment matured he rolled over the principal and
interest into another contract and that that contract was due to
mature in December 2008.  JD #2 also stated that he has received
regular monthly payments regarding his AMA investment, however
recently an interest check was not received on it due date.  JD #2
went to COSMO's home and demanded to be paid.  JD #2 and others

35

were sent their interest checks the following day. I re-interviewed JD #2 on January 23, 2009 and he told me that, as of that date, he had not received any payments on the AGAPE loan that was due to mature in December 2008. He told me that he currently has $400,000 outstanding in AGAPE in his personal capacity and that he and others (as an investment group) also invested $1 million in AGAPE and that money is still outstanding.

**John Doe # 3**

47.   John Doe #3 ("JD #3"), an individual who resides in Westchester County, invested $5,000 in AMA on June 30, 2008. During an interview on November 4, 2008, JD #3 reported that he had previously invested approximately $10,000 in either AMA or AGAPE. JD #3 invested in AMA through an individual who is identified as a sub-broker of R-4. JD #3 has never received any principal back on any of his investments through AGAPE or AMA. JD #3 has instead allowed his earnings and monthly interest to be re-invested in subsequent deals. JD #3 has $15,000 worth of outstanding investments at this time with AMA or AGAPE.

**John Doe # 4**

48.   John Doe #4 ("JD #4"), an individual who resides in Nassau County, invested $3,000 in AMA on June 30, 2008. During an interview on November 5, 2008, JD #4 reported that he had previously invested approximately $45,000 in either AMA or AGAPE.

36

JD.#4 invested in AMA through an individual who is a sub-broker
working under R-6.

**John Doe # 5**

49.    John Doe #5 ("JD #5"), an individual who resides in
Westchester County, invested $50,000 in AMA on July 1, 2008.
During an interview on November 5, 2008, JD #5 reported that he
had previously invested approximately $100,000 in either AMA or
AGAPE.  JD #5 invested in AMA through an individual who is
identified as a sub-broker of R-1.  JD #5 stated that he has
received interest back from his first two contracts with AGAPE but
has rolled over the proceeds of his investment into AMA.  I re-
interviewed JD #5 on January 23, 2009 and he told me that although
he has received interest checks on that $50,000 he invested in
AMA, he still has $40,000 of that investment outstanding in the
company.  In addition, he has yet to receive his December interest
payment from AMA for that investment.  Furthermore, of the
$100,000 he invested in AGAPE that was purportedly being invested
in bridge loans, the interest checks have been delayed for several
months.  Specifically, he stated that he was told by his sub-
broker that the loan was due to mature on November 24, 2008 and
that he would receive payment shortly thereafter.  In November, JD
#5 was told the loan maturity date was pushed back until December,
and in December JD #5 was told the new maturity date would be
January 20, 2009.  JD #5 spoke to his broker on January 23 and was

37

told that the loan had defaulted and that the company was unable to pay him his principal or his interest. JD # 5 was told that he would not be paid for approximately eight months. Therefore, although he previously had received $26,000 in interest checks, he still has an outstanding balance with AGAPE of $74,000 of his original $100,000 investment.

### John Doe #6

50.    John Doe #6 ("JD #6"), an individual who resides in Suffolk County, invested $20,000 in AMA on June 30, 2008. During an interview on November 6, 2008, JD #6 reported that he had previously invested approximately $15,000 in either AMA or AGAPE. On January 23, 2009 I re-interviewed JD #6. Although he has received some interest payments on his $35,000 investment, as of this date he still has $25,000 outstanding invested in AMA.

### John Doe # 7

51.    John Doe #7 ("JD #7"), an individual who resides in Westchester County, invested $50,000 in AMA on July 1, 2008. During an interview on November 5, 2008, JD #7 reported that he had previously invested approximately $100,000 in either AMA or AGAPE. JD #7 invested in AMA through an individual who is a sub-broker who works under R-7. Currently, JD #7 has $150,000 invested in AGAPE and AMA and has not received any money back from his investment. JD #7 also said his sub-broker rolled over his investment into another contract without consulting him first. JD

#7 stated that he would have liked the opportunity to receive his interest in cash. I re-interviewed JD #7 on January 24, 2009. JD #7 told me that he was supposed to receive an interest payment in December. In December, his broker told JD #7 that his payment would be delayed until January 20, 2009. On January 23, 2009 the broker informed JD #7 that he would not be receiving any payment in January and that the payment was delayed indefinitely.

52. In an effort to trace the $404,000 invested by Jane Doe #1 and John Doe #1 through John Doe #7 on June 30, 2008 and July 1, 2008, I reviewed AMA bank records and found that the $404,000 invested was deposited into AMA sub-accounts and subsequently transferred to the AMA Main Account at the end of each respective day. Furthermore, my review of AMA's bank records for the period July 2, 2008 through July 6, 2008, showed that additional money from other investors continued to be deposited into the AMA sub-accounts and was subsequently transferred to the AMA Main Account such that the opening balance in the AMA Main account on July 7, 2008 was approximately $2.1 million. On July 7, 2008, the defendant NICHOLAS COSMO transferred $1,000,000 from the AMA Main account to the AGAPE Main Account.[16] On July 7, 2008,

---

[16]There is no legitimate reason for the money to be transferred from the AMA account to the AGAPE account as both businesses are supposed to operate separately and were created to fund loans to completely different entities.

COSMO transferred $1,000,000 from the AGAPE Main Account to the MF
Global account.

## VIII.   **Additional Investors**

53.   In addition to the eight investors described above,
there are now a number of additional victims who have come forward
and contacted the FBI about AGAPE.   Specifically, on January 22-
23, 2009, 20 AGAPE investors contacted the FBI to complain that
they were not being paid on their investments.[17]   Those investors
report that they collectively have more than $2 million invested
in AGAPE.   Specifically, seven have invested up to $20,000, four
have invested up to $99,000, four have invested up to $199,000 and
five have invested between $200,000 to $400,000.

54.   Jane Doe #2(JaD #2), one of the 20 investors
described above, currently has $19,000 invested in AGAPE.
According to JaD #2, she was told by her account representative
that her investment went to a loan that was due to mature in
September 2008.   In September 2008, her account representative
told JaD #2 that the borrower was given an extension of the loan
repayment and that the new maturity date was December 2008.   In
December she filled out forms with AGAPE requesting her entire
principal and delayed interest payments be paid back to her in
full.   On January 22, 2009 she was told that her money had been

---

[17] An additional 20 individuals have called the FBI office in
Manhattan on January 24, 2009 stating that they have invested in
AGAPE and are fearful that they are victims of a financial scam.

invested in a $30,000,000 bridge loan and the borrower had defaulted. The AGAPE representative told JaD #2 that legal proceedings would be commenced to try to recoup this money but that they did not know when she would receive her money.

55. Jane Doe #3 (JaD #3), one of the 20 investors described above, currently has $116,000 outstanding in investments with AGAPE. She was interviewed by the FBI on both January 23 and January 24, 2009. According to JaD #3, she began investing in AGAPE in February 2007, has never received an interest payment on her investment and has continued to roll over her investment profits. In September 2008, she was told by her account representative that her investment that was due to mature in September was loaned to a company that was having difficulty repaying the loan. AGAPE extended the loan three months and the new maturity date was in December. In December, her account representative told her that the maturity date was extended to January 26, 2009. In early January, JaD #3 filled out forms with AGAPE requesting her entire principal and interest be repaid to her. On January 23, 2009, JaD #3 was told by her account representative that the company in which her investment was placed had defaulted and that legal proceedings would be initiated to recoup the money. The representative told her that there would be a six to eight month delay in repayment.

41

## IX. The Search Warrants

56. For the reasons set forth below, I submit that there is probable cause to believe that presently concealed with the SUBJECT PREMISES are documents and articles which constitute evidence of, the fruits of, and/or the means of committing the mail fraud described in this affidavit.

57. The SUBJECT PREMISES comprise the principal offices and satellite offices of AGAPE and AMA. The Hauppauge address is listed on the AGAPE client contracts as well as on the AGAPE website as the company's main address.

58. On November 6, 2008, during the undercover investigation, I visited SUBJECT PREMISES #1 and met with COSMO. I was posing as a potential investor but COSMO and R-2 also knew that I was employed as a U.S. Postal Inspector. During our meeting on November 6, 2008, COSMO refused to answer any substantive questions about AGAPE or AMA.

59. During my visit to SUBJECT PREMISES # 1, I made the following observations. The two front doors to Suite 106 are made of glass and are locked. An intercom buzzer must be used in order to gain entry into an entrance foyer in which a receptionist's desk in located. While there, I immediately noticed AGAPE signs throughout the foyer including large lettering behind the desk that spelled "Agape World." I further noticed several completed

42

checks neatly stacked in the front corner of the receptionist's desk.

60. While I was escorted by an AGAPE employee to an adjacent conference room, I noticed that a main corridor ran from the front of the office towards the back. To one side of this corridor is the conference room in which I met with COSMO while on the other side there appeared to be cubicles or the work spaces of several employees. I noticed computers, file cabinets, and documents throughout the office. Furthermore, I noticed approximately four other employees in the office in addition to COSMO.

61. On October 27, 2008, I visited SUBJECT PREMISES #2, located in Maspeth, NY, posing as a prospective investor and met with Employee #2 ("EE #2") and Employee #3 ("EE #3"). EE #2 identified herself as the office secretary and announced that she has more than $200,000 invested in both AGAPE and AMA. EE #3 identified himself as an AGAPE broker, although he admitted that he still works at his previous job as a construction worker. During this meeting, EE #2 provided me with several AGAPE client contracts as well as a copy of the AMA Participation Agreement, in which the 4 percent monthly interest rate being offered to investors is memorialized. Prior to printing the aforementioned documents for me on an office printer, EE #2 retrieved electronic copies of them from a desktop computer located in her workspace.

43

During my meeting with EE #2, I noticed a tall stack of documents
on her desk, some of which had checks attached.  When I asked EE
#2 whether these documents meant business was thriving, she stated
that the documents were AGAPE and/or AMA contracts for existing
clients.

      62.  I also made the following observations of SUBJECT
PREMISES #2 during my visit.  Visitors enter the office through a
street-level glass door on which the words "Agape World" are
either etched or painted.  There is also a blue awning above said
door on which the words "Agape World" are printed.  Since the
glass door is locked, visitors must press a buzzer on an intercom
system in order to gain access.  Once inside this door, the AGAPE
office is the only door at the top of the one-flight staircase.
The door at the top of the steps is made of solid wood with no
windows or signs.  Entry via this door leads to a large main room
in which three desks were noted.  The desk to the immediate left
is the workspace of EE #2.  Above this desk is a large "Agape
World" sign.  The two desks at the opposite end of the room belong
to brokers, according to EE #2.  The aforementioned office printer
is situated in this room, near the brokers' desks.  Adjacent to
this main room is an office, said to belong to R-2, according to
EE #2.  There is also a bathroom and another exit door off of the
main room.

44

63.  On November 19, 2008, I visited SUBJECT PREMISES
#3, located in Jackson Heights, NY.  This office is located in the
southwest corner of the sixth floor of a commercial building
located on the north side of 37th Avenue, between 82nd Street and
83rd Street.  The door leading to SUBJECT PREMISES #3 is made
primarily of glass and provides a clear view of much of the
interior of the suite.  Painted on the glass door are the words
"Agape World" along with the company logo.  During my observation,
I noticed that the office contains desks, file cabinets,
computers, telephones, and paper files.  I observed one individual
sitting at a desk and speaking on a telephone.  I further observed
hanging folders and files inside of a cabinet directly behind this
individual.

64.  Based upon my observations as of January 22, 2009,
AGAPE and AMA continue to operate from inside of all of the
SUBJECT PREMISES.  In addition, surveillance was conducted at
SUBJECT PREMISES # 1, and cars registered COSMO were also parked
there as of January 23, 2009.

65.  Based upon my training and experience as a Postal
Inspector who has executed numerous search warrants over the past
eleven years in connection with fraud cases such as this, and on
my physical observations of the SUBJECT PREMISES, as well as my
training and experience, I am aware that the offices of
professional investment companies such as AGAPE and AMA routinely

45

maintain, for extended periods of time, numerous documents and articles to operate such businesses.

66.    I believe that inside of the SUBJECT PREMISES certain property will be found, to wit: (1) books and records, including but not limited to, records of funds received, records of funds disbursed, customer files, customer lists. commission binders, mailing and shipping records, mailing devices, personnel records, loan files, interest payment logs, cancelled envelopes, pitch sheets, lead sheets, correspondence and inventory records; (2) bank records and other financial institution records, including but not limited to, bank statements, checks, deposit slips, withdrawal slips and transfer slips, trading records, employee records, payroll records, receipts, invoices, commission payment records, financial statements; (3) other business records including but not limited to records of incorporation, corporate minutes, billing records, telephone records, e-mails, facsimiles, promotional materials, loan contracts and other loan records, UCC filing records, records of receipts, records of disbursement, tax returns and supporting documentation, 1099's, W-2's, contracts with other businesses or individuals, and records relating to businesses or individuals and records relating to corporations that AGAPE or AMA have either sent or received funds; (4) safes, key-lock strong boxes, suitcases, locked cabinets, concealed storage compartments, and other types of locked, closed, and/or

46

hidden containers that may be used to store and secrete United
States currency, books, records, documents, financial instruments,
and other items of the sort to prevent the discovery of theft of
such items; (5) computers and related equipment, including but not
limited to, computer hard drives, zip drives, thumb or flash
drives, laptop computers, passwords, storage devices such as
discs, CD ROMS, video tapes and audio tapes, CD's, DVD's and
computer software; (6) facsimile machines used to send or receive
documents, which may be analyzed to determine telephone numbers to
and from which documents have been sent and which may also be
analyzed to determine whether documents bearing certain fax lines
were sent from a particular machine, and any other devices or
equipment capable of storing data or text in any format, including
but not limited to cellular telephones, personal digital
assistants, and any other storage media capable of containing data
or text in magnetic, electronic, optical, digital, analog or any
other format, used to store information described above; (7)
records relating to mail or wire transfers directed to or from
AGAPE, AMA, and COSMO; all of which property constitutes evidence,
fruits and instrumentalities of violations of Title 18, United
States Code, Section 1341.

   67. Based upon my training and experience, I know that
the above-listed records can also be created and/or stored within
a computer or other forms of electronic media, and that searching

and seizing this information from a computer or other media devices often requires agents to seize most or all of the electronic storage devices (along with related peripherals), so that these items can be searched later by a qualified computer expert in a laboratory or other controlled environment.  This is true because:

      a.   Computer storage devices (such as hard disks, DVD's, CD-ROM's, floppy disks, tapes, compact disks, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it relates to criminal activity.  This sorting process can take weeks or months, depending on the volume of data stored and it would be impractical to attempt this kind of data search on-site.

      b.   Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.  The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to

recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system), the controlled environment of a laboratory is essential to complete an accurate analysis.

## X.    Conclusion

WHEREFORE, your deponent respectfully requests that a search warrant be issued authorizing any officer of the Postal Inspection Service and the Federal Bureau of Investigation, with appropriate assistance, to enter THE PREMISES KNOWN AND DESCRIBED AS AND DESCRIBED AS (1) AGAPE WORLD, INC. AND AGAPE MERCHANT ADVANCE LLC, 150 MOTOR PARKWAY, SUITE 106, HAUPPAUGE, NEW YORK, A FOUR STORY BUILDING ON MOTOR PARKWAY WITH THE NUMBERS 150 AFFIXED TO A SIGN OUTSIDE THE BUILDING, AND GLASS DOORS AT THE FRONT ENTRANCE OF THE BUILDING AND SUITE 106 ON THE FIRST FLOOR, WITH A GLASS DOOR ENTRANCE AND A PLACARD AFFIXED ON THE RIGHT SIDE OF THE GLASS DOOR STATING AGAPE WORLD INC., AND A SIGN AGAPE WORLD INC., AFFIXED ABOVE THE RECEPTIONISTS DESK ONCE INSIDE SUITE 106, AND VISIBLE THROUGH THE FRONT GLASS DOORS, AND (2) THE PREMISES KNOWN AND DESCRIBED AS AGAPE WORLD, INC. AND AGAPE MERCHANT ADVANCE, LLC, 64-13B GRAND AVENUE, MASPETH, NEW YORK, A TWO STORY ATTACHED BRICK BUILDING ON THE WEST SIDE OF GRAND AVENUE, BETWEEN 64th STREET AND REMSEN PLACE, WITH A GLASS DOOR ON THE FIRST FLOOR CONTAINING THE

49

WORDS AGAPE WORLD IN BLUE LETTERING, AND A BLUE AWNING WITH WHITE

LETTERING WITH THE WORDS AGAPE WORLD AND A COMPANY LOGO AND THE

ADDRESS 64-13 B, AND THE OFFICE IS LOCATED ON THE SECOND FLOOR AND

IS THE ONLY DOOR LOCATED AT THE TOP OF THE STAIRWAY, AND (3) THE

PREMISES KNOWN AND DESCRIBED AS AGAPE WORLD, INC. AND AGAPE

MERCHANT ADVANCE LLC, 82-11 37TH AVENUE, SUITE 602, JACKSON

HEIGHTS, NEW YORK, A NINE STORY ATTACHED COMMERCIAL BUILDING ON

THE NORTH SIDE OF 37TH AVENUE BETWEEN 82ND STREET AND 83RD STREET,

WITH THE NUMBERS 82-11 AND WORDS  A & C PALACE IN GOLD LETTERING

ABOVE FRONT ENTRANCE, AND A GLASS DOOR AT THE ENTRANCE OF SUITE

602 ON THE SOUTHWEST SIDE OF THE 6TH FLOOR WITH WHITE LETTERING ON

THE GLASS DOOR CONTAINING THE WORDS AGAPE WORLD AND THE COMPANY

LOGO, and therein to search for and seize the items listed on the

attached search warrants, all of which property constitutes

evidence, fruits and instrumentalities of violations of Title 18,

United States Code, Section 1341.

WHEREFORE, your deponent further respectfully requests that an arrest warrant be issued for the arrest of the defendant NICHOLAS COSMO, so that he may be dealt with according to law.

In addition, it is respectfully requested that this affidavit and the warrant be filed under seal until further order of the court.

*Richard C̄_____*

RICHARD CINNAMO
Postal Inspector
U.S. Postal Inspection Service

Sworn to before me this
26 day of January, 2009

UNITED S_____ _____ JUDGE
EASTERN DISTRICT OF NEW YORK

This affidavit and the arrest and search warrant are to be filed under seal until further order of the court.

|s|  E. Thomas Boyle, USMJ

EASTERN DISTRICT OF NEW YORK

Exhibit C

**FILED**

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 2 7 2009 ★

BROOKLYN OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

09 0351

United States Commodity Futures Trading
Commission,

                Plaintiff,

    vs.

Nicholas Cosmo, Agape World, Inc., and Agape
Merchant Advance LLC,

                Defendants.

Case No.:

COMPLAINT FOR INJUNCTIVE AND
OTHER EQUITABLE RELIEF AND FOR
CIVIL MONETARY PENALITES
PURSUANT TO THE COMMODITY
EXCHANGE ACT

WEXLER, J

LINDSAY, M.J.

## I.  SUMMARY

1.  From at least January 2004 through December 2008 ("Relevant Period"), defendants Nicholas Cosmo ("Cosmo") and Agape World, Inc. ("Agape World"), and from at least November 2007 defendant Agape Merchant Advance LLC ("Agape Merchant") (collectively, "Defendants") engaged in a fraudulent scheme in which they solicited tens of millions of dollars from dozens of investors for the stated purpose of investing in bridge loans and merchant advances but instead, engaged in unauthorized commodity futures trading which resulted in millions of dollars in losses.  None of this trading activity or these trading losses were disclosed to investors.

2.  By virtue of this conduct and the further conduct described herein, Defendants have engaged, are engaging, and/or about to engage in fraudulent acts and practices that violate the anti-fraud provisions of Sections 4b(a)(2)(i) and (iii) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(2)(i) and (ii), and Sections 4b(a)(1)(A) and (C) of the Act as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC

3

Reauthorization Act ("CRA")), § 13102, 122 Stat. 1651 (effective June 18, 2008), to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C).

3. Cosmo committed the acts and omissions described herein within the course and scope of his employment at both Agape World and Agape Merchant. Therefore, both Agape World and Agape Merchant are liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), as principals for Cosmo's violations of the Act.

4. Cosmo is liable under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), as a controlling person of Agape World and Agape Merchant for their violations of the Act, because he did not act in good faith or knowingly induced, directly or indirectly, the acts constituting their violations.

5. Accordingly, the United States Commodity Futures Trading Commission ("Commission" or "CFTC") brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), to enjoin Defendants' unlawful acts and practices and to compel Defendants' compliance with the Act and the Commission's Regulations. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, preliminary and permanent injunctions, trading and registration bans, a civil monetary penalty, restitution, pre-judgment and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

6. Unless restrained and enjoined by the Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and in similar acts and practices as more fully described below.

4

## II.    JURISDICTION AND VENUE

7.    The Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(2006), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

8.    Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that Defendants transact business in this District, and acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

## III.    THE PARTIES

9.    Plaintiff United States Commodity Futures Trading Commission is an independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2006).

10.    Defendant Nicholas Cosmo resides in Lake Grove, New York.  Cosmo has never been registered with the CFTC in any capacity.

11.    Defendant Cosmo is the owner of both Defendants Agape World and Agape Merchant.  Cosmo's criminal history includes a federal conviction for mail fraud.  The Defendant Cosmo pleaded guilty and was sentenced on January 15, 1999 to a prison term of 21 months followed by three years of supervised release and ordered to pay restitution of $1778,000 plus interest.

12.    Furthermore, according to the National Association of Securities Dealers ("NASD"), Defendant Cosmo's broker's license was revoked in 2000 due to his 1999 conviction.  According

to the NASD, Cosmo was censured, fined $68,209 and barred from association with any NASD members in any capacity.

13.     Defendant Agape World, Inc. is a New York corporation with its main offices located at 150 Motor Parkway, Hauppauge, New York 11788. Agape World has never been registered with the Commission in any capacity.

14.     Defendant Agape Merchant Advance LLC is a New York limited liability company with its main offices located at 150 Motor Parkway, Hauppauge, New York 11788. Agape Merchant has never been registered with the Commission in any capacity.

## IV.     FACTS

15.     During the Relevant Period, Cosmo and Agape World have been operating an investment scheme in which they solicit investors to supply funds for short-term loans, known as bridge loans, paying a high interest rate to those who invest.

16.     Since at least November 2007 to December 2008, Cosmo and Agape Merchant have been operating an investment scheme in which they solicit investors to supply funds to commercial merchants in exchange for proceeds from future credit cards sales.

17.     Cosmo exercised control over the bank accounts maintained by Agape World and Agape Merchant into which investors deposited funds.

18.     During the Relevant Period, without the consent or knowledge of the Agape World and Agape Merchant investors, Cosmo caused Agape World investors' funds and Agape Merchant investors' funds to be transferred from the Agape World and Agape Merchant bank accounts to various commodity futures trading accounts maintained in the name of Cosmo, individually, Agape World, and/or Agape Merchant at various futures commission merchants

("FCMs "), all of whom are registered with the Commission, for the purpose of trading commodity futures.

19.     For example, in account opening documents for a commodity futures trading account in the name of Agape World at MF Global Inc. ("MF Global"), Cosmo identified himself as President of Agape World and that he had sole control over trading in this trading account.

20.     Cosmo further represented in his account paperwork at MF Global that no other persons or entities had a financial interest in this trading account. This statement is false since this account was funded with funds from investors.

21.     Without the consent or knowledge of investors, Cosmo traded futures contracts in these various FCM trading accounts and lost tens of millions of dollars. This trading activity and these trading losses were never disclosed to investors.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

**Violations of Section 4b of the Act and the Act as Amended by the CRA
(Fraud by Misrepresentations and Omissions)**

20.     The allegations set forth in paragraphs 1 through 21 are re-alleged and incorporated herein by reference.

21.     Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), make it unlawful for any person to cheat or defraud or attempt to cheat or defraud; or willfully deceive or attempt to deceive by any means whatsoever other persons in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such

commodity, or the produce or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

22.     Sections 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at , 7 U.S.C. §§ 6b (a)(1)(A) and (C), make it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person – (A) to cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for the other person.

23.     As set forth above, in or in connection with futures contracts, made, or to be made, for or on behalf of other persons, Defendants cheated or defrauded or attempted to cheat or defraud clients or prospective clients, and willfully deceived or attempted to deceive clients or prospective clients by, among other things, soliciting funds from investors for the stated purpose of investing in bridge loans and merchant advances but, instead, engaging in unauthorized commodity futures trading which resulted in tens of millions of dollars in losses. None of these trading activities or these trading losses were disclosed to investors.

24.     Defendants engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

8

25.    By this conduct, Defendants violated Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and violated Sections 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008,

26.    Cosmo controlled Agape World and Agape Merchant, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Agape World's and Agape Merchant's conduct alleged in this Count. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Cosmo is liable for Agape World's and Agape Merchant's violations of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and for their violations of Sections 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008.

27.    Cosmo is liable under Section 13(b) of the Act, 7 U.S.C. § 13c(b), as a controlling person of Agape World and Agape Advance for its violations of the Act, because he did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations.

28.    Each misrepresentation or omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008.

## VI.    RELIEF REQUESTED

**WHEREFORE,** the CFTC respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers, enter:

a)     An order finding that Defendants violated Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), and Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C)·.

b)     An order of preliminary and permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any Defendant, including any successor thereof, from engaging, directly or indirectly:

     (i)     in conduct in violation of Sections 4b(a)(2)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C); and

     (ii)     in any activity related to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) (2006) ("commodity interest"), including but not limited to, the following:

     (aa)     from trading of any commodity interest account for himself or on behalf of any other person or entity;

     (bb)     from soliciting, receiving, or accepting any funds in connection with the purchase or sale of any commodity interest contract;

     (cc)     from applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2008), or acting as a principal, agent, or any other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC, except as provided for in Regulation 4.14(a)(9); and

(dd)    from engaging in any business activities related to commodity

interest trading.

c)    An order directing Defendants to make full restitution to every person or entity

whose funds Defendants received or caused another person or entity to receive as a result of acts

and practices that constituted violations of the Act, as described herein, and pre- and post-

judgment interest thereon from the date of such violations;

d)    An order directing Defendants to disgorge, pursuant to such procedure as the

Court may order, all ill-gotten gains or benefits received from the acts and practices which

constitute violations of the Act, as described herein, and pre- and post-judgment interest thereon

from the date of such violations;

e)    An order directing each Defendant to pay a civil monetary penalty in the amount

provided pursuant to Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1 (2006), and Commission

Regulation 143.8, 17 C.F. R. § 143.8 (2008), or triple the monetary gain to each Defendant for

each violation of the Act described herein, plus post-judgment interest;

f)    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2); and

g)    Such other and further relief as the Court deems proper.

Dated:  New York, NY
        January 27, 2009

U.S. COMMODITY FUTURES
TRADING COMMISSION

Lenel Hickson
Acting Regional Counsel

By: _____

11

David Acevedo
Chief Trial Attorney

Steven I. Ringer
Chief Trial Attorney

Elizabeth C. Brennan
Senior Trial Attorney

Linda Y. Peng
Senior Trial Attorney

Division of Enforcement
U.S. Commodity Futures Trading
Commission
Eastern Regional Office
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9747