KAY and GEORGE SULLIVAN,
MICHAEL and KATHLEEN TIRELLI,
STEVE BONNANO and ROSEANN M.
BOLOGNA,
individually, and on behalf of all others
similarly situated,

        Plaintiffs,

  v.

AGAPE WORLD, INC., NICHOLAS
COSMO, AGAPE MERCHANT ADVANCE
LLC, JOHN DOES 1-12,
BANK OF AMERICA, N.A., MF GLOBAL,
INC.,TRANSACT FUTURES, ALARON
TRADING CORPORATION, Doing Business
As ALARON FUTURES AND OPTIONS,
and XYZ CORPS. 1-10,

        Defendants.

**Civil Action No. 2:09-cv-1274 LDW (ETB)**

**FIRST AMENDED CLASS ACTION COMPLAINT**

  **(1) SECURITIES FRAUD**
  **(2) COMMON LAW FRAUD**
  **(3) BREACH OF FIDUCIARY DUTY**
  **(4) AIDING AND ABETTING**
     **COMMON LAW FRAUD**
  **(5) AIDING AND ABETTING**
     **BREACH OF FIDUCIARY DUTY**
  **(6) NEGLIGENCE**

**DEMAND FOR JURY TRIAL**

     Plaintiffs, by and through their attorneys, file this First Amended Class Action Complaint against Agape World Inc., Nicholas Cosmo, Agape Merchant Advance LLC, and John Does 1-12 (collectively, "Agape"), Bank of America, N.A. ("Bank of America"), MF Global, Inc. ("MF Global"), Transact Futures ("Transact"), Alaron Trading Corporation doing business as Alaron Futures and Options ("Alaron") and XYZ Corps. 1-10, on behalf of themselves and other similarly situated individuals or businesses who invested into fraudulent schemes operated by Agape. Upon information and belief, as well as the investigation of counsel, Plaintiffs allege as follows:

# INTRODUCTION

1.      Starting in 2003, Nicholas Cosmo ("Cosmo"), a convicted felon who had just completed a 21 month sentence in Federal Prison in Allenwood, Pennsylvania commenced a fraudulent investment scheme through an entity called Agape.  The scheme operated through two companies he controlled and approximately 12 individuals acting as salesman and brokers.  Through widespread use of fraudulent means, Agape obtained approximately $400 million from thousands of blue collar investors. These victims, largely of modest income and means, including police officers, post office employees, social security clerks, and widows investing life insurance proceeds, lost their entire life and retirement savings.

2.      From the start, defendant Bank of America ("Bank of America") played an integral role in that scheme eventually becoming intertwined with Agape's and Cosmo's operations by providing an array of extraordinary services and access.  Bank of America went so far as to assign its own employees to work directly for Agape from the Agape offices.  Moreover, Bank of America provided Agape and Cosmo with access to confidential account information, which was use to solicit these customers into investing in the scheme.  Without their substantial participation, the scheme would not have victimized many life-long residents of Long Island, New York.

3.      Through Agape, Cosmo falsely convinced Plaintiffs and other investors that he was financing bridge loans for construction projects or other real estate developments.  He failed to advise these investors that he re-sold those very same interests hundreds of times to other unknowing investors.  For example, he would provide a $1 million dollar loan to a developer and sell participations from investors totaling $60 million from investors.  He used the excess or "extra" money raised to: (1) pay handsome returns to early investors and his confederates;

(2) reward and incentivize "brokers" who brought in new investor money; and, ultimately (3) conduct rampant and speculative commodities trading. Throughout the scheme he spent investor funds excessively on his own lavish personal lifestyle.

4.      Bank of America was at the epicenter of this scheme. The bank's brazen willingness to allow Cosmo and his cadre of brokers and sub-brokers, to have extraordinary access to its employees, infrastructure and banking services made the scheme work. In effect, Bank of America established, equipped and staffed a branch office at the heart of Agape's headquarters (the "Agape Branch" or the "Agape Branch of Bank of America") in violation of its own internal policies and authoritative anti-money laundering and other regulatory controls. With Bank of America's knowledge, this branch assisted, facilitated and furthered the fraudulent scheme as described more fully herein. This assistance included but was not limited to: (1) Bank of America assigned one or more representatives to work directly out of Cosmo's office, approximately 28 miles from the Bank of America branch where Agape and Cosmo had their bank accounts; (2) Bank of America provided its onsite representatives at Agape with onsite bank equipment and/or computer systems to enable direct access to Bank of America's accounts and systems; and (3) Bank of America's onsite representatives at Agape had the ability to monitor and check account balances, accept deposits and issue checks. Essentially, Bank of America established a fully functional bank branch manned by its own representatives within Agape's offices.

5.      Bank of America, additionally provided substantial assistance to Agape's schemes by: (1) allowing a convicted felon to open, direct, control and have extraordinary access to at least two dozen accounts opened under different names; (2) aggregating and approving the transfer of funds among Agape accounts on a regular basis (perhaps as often as once an

evening) totaling several millions of dollars; (3) failing to detect that Agape and Cosmo failed to engage in legitimate business loans and instead were selling securities without required licenses or registration; (4) approving and effecting, on a regular basis, transfers of up to $100 million dollars in wires from Agape's accounts to commodities and futures trading firms for speculative transactions which looted Agape's assets; (5) failing to investigate the source of hundreds of millions of dollars of funds going into Agape's and Cosmo's accounts. Bank of America's conduct violated its own "know its customer" and well established anti-money laundering rules; and (6) providing access to confidential customer account information which allowed Agape to solicit investments from these Bank of America customers.

6.     Bank of America's onsite representatives had actual knowledge that Cosmo was commingling investor money, diverting investor money to his own accounts, engaging in virtually no legitimate business whatsoever and speculatively trading investor money in the commodities and futures markets.

7.     In addition to the direct and knowing assistance it provided to Agape, Bank of America also dismantled its compliance and supervisory infrastructure, personnel and surveillance systems designed to detect and prevent frauds such as Agape's. Until early 2006, Bank of America had a specialized compliance group located in Boston, MA, which reviewed and supervised activity for its "Premier Banking & Investments" customers such as Agape and Cosmo. This compliance group was charged with enforcing Bank of America's "Know Your Customer" rules and anti-money laundering rules against any perceived "high risk" customers, and became known as the "High Risk Group". Bank of America pressured employees of its "High Risk Group" to circumvent bank rules and/or approve business

without proper due diligence, then eventually shut down the "High Risk Group" because it was impeding business. In short, with foreknowledge that illicit or suspicious activity was occurring, Bank of America shut down its High Risk Group and chose revenue over compliance. This conscious decision by Bank of America further facilitated and aided Agape's and Cosmo's fraud.

8.      From November 2007 to January 2009, MF Global, Transact, and Alaron which are futures and commodities trading firms or merchants, and XYZ Corps. 1-10 (collectively, the "FCMs"), which represent other futures and commodities merchants, also had knowledge of, and provided substantial assistance to, Cosmo's fraudulent schemes. The FCMs established trading accounts for Cosmo and Agape despite the fact that Cosmo was barred for life by the Financial Industry Regulatory Authority ("FINRA") from association with any investment broker-dealer. Indeed, based on such facts, other similar firms refused Cosmo's business. As speculating in the futures markets became Agape's only business activity, the FCMs assisted Cosmo in running an illegal unregistered commodities pool. As a result, the Commodity Futures Trading Commission ("CFTC") commenced a proceeding against Agape and Cosmo.

9.      Cosmo's and Agape's speculative commodities futures trading resulted in losses of $80 million of funds belonging to Plaintiffs who invested in Agape. Cosmo looted Agape with his trading through the FCMs which never should have accepted this business. The FCMs have "know your customer duties" which require these firms to make sure that customers like Cosmo and Agape are not trading with investor money. Cosmo also assigned an uneducated and inexperienced "administrative assistant" to execute most of the trades. This "assistant" had no training, licenses or knowledge about futures trading, particularly in executing trades on behalf of a commodities pool. The FCMs should have refused Agape's

business, given their strict regulatory requirements. In sum, the FCMs substantially assisted Agape's and Cosmo's fraud, and played a substantial role in the loss of Plaintiff and investor funds.

10.     Plaintiffs bring this action seeking monetary damages for the injury to its and the Class members' business or property caused by Defendants' fraud, breaches of fiduciary duty, aiding and abetting fraud, aiding and abetting a breach of fiduciary duty, and negligence, and they seek an accounting for the losses suffered. Plaintiffs also bring this action seeking monetary damages for the injury to Plaintiffs and Class Members caused by Defendants' negligence and violations of common law.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and jurisdiction over the state law claims, and any parties against whom no federal claim is asserted, pursuant to 28 U.S.C. § 1367, as all such claims are part of the same case or controversy. In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) as the aggregate amount in controversy exceeds $5,000,000 and at least one class member is a citizen of a State different from a defendant, and more than one third of all Class members may reside outside of the State of New York. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §1965(b) and (d).

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (b). Venue is also proper under 18 U.S.C. §1965(a) because all Defendants transact or have transacted business in this District at times material to this action.

13.     This action involves common issues of fact and grows out of the same events and transactions as *United States of America v. Nicholas Cosmo*, 09-MJ-0066 (E.D.N.Y.); *Triton*

*Capital Partners, LLC, et al. v. Nicholas Cosmo, et al.*, 09-CV-0827 (E.D.N.Y. filed

February 26, 2009); and *Heany, et al. v. Nicholas Cosmo, et al.*, 09-CV-0757 (E.D.N.Y. filed

February 24, 2009)

## PARTIES

14.     Plaintiffs Kay and George Sullivan reside in Rockaway Park, New York.  Kay is a

schoolteacher and George is a policeman and together they suffered a loss of approximately

$180,000 from Agape's scheme.

15.     Plaintiffs Michael and Kathleen Tirelli reside in Patchogue, New York.  Michael,

who suffers from stomach cancer, is a musician and works in a clothing store, and Kathleen

is a massage therapist and new mother.  Together, they suffered a loss of approximately

$125,000 from Agape's scheme.

16.     Plaintiff Steve Bonnano resides in Wantagh, New York.  He is a retired Captain with

the New York Police Department who suffers from heart and back problems.  He suffered a

loss of approximately $100,000 from Agape's scheme.

17.     Plaintiff Roseann M. Bologna ("Bologna") resides in Howard Beach, New York.  For

21 years, she has worked as a clerk for the Social Security Administration. She suffered a

loss of approximately $180,000 from Agape's scheme.

18.     Defendant Agape World, Inc. ("Agape World") is a New York corporation that was

organized in August 2000.  Nicholas Cosmo was the President and controlling owner of this

company.   At all relevant times, its headquarters were located at 150 Motor Parkway,

Hauppauge, New York, within the District.

19.     Defendant Nicholas Cosmo ("Cosmo") was the President and controlling owner of

Agape World and AMA.  He resided in Lake Grove, New York.  Cosmo is a prior felon who,

on January 15, 1999, pled guilty to mail fraud relating to an investment scheme and served 21 months in prison and was ordered to pay restitution of $177,000. As a result of the guilty plea, in 2000, FINRA revoked his stockbroker's license, fined him $68,209 and barred him from association with any investment or securities broker-dealer.

20.     Defendant Agape Merchants Advance LLC ("AMA") is a New York limited liability company that was organized in November 2007. Cosmo was the Managing Member and controlling member of AMA. It shared headquarters with Agape. John Does 1-12 are individuals whose identities are not known but who were "brokers" who acted as employees or agents of Agape by soliciting investors. The John Does 1-12 held accounts or subaccounts in the respective names on behalf of Agape, and received lucrative commissions and fees for bringing in new investor money. (together, Agape World, Cosmo, AMA and John Does 1-12 shall be referred to as "Agape").

21.     Defendant Bank of America, National Association ("Bank of America") is a subsidiary of Bank of America Corporation, a Delaware corporation headquartered in Charlotte, North Carolina. Bank of America provides a diverse range of banking services in 32 states including New York State. At relevant times, Bank of America had branches located at 190 Vanderbilt Motor Parkway, Hauppauge, New York and at 60 Hempstead Avenue, West Hempstead, New York. Bank of America also established a functioning branch office onsite at Agape's headquarters at 150 Motor Parkway in Hauppauge, New York.

22.     Defendant MF Global Inc. ("MF Global") is a futures and commodities firm with a principal place of business at 440 South LaSalle Street, 20thFloor, Chicago Illinois. At

relevant times, Agape and/or Cosmo had a commodities and futures trading account with MF Global.

23.    Defendant Transact Futures ("Transact") is a futures and commodities firm with a principal place of business at 14 West Jackson Blvd., 24th Floor, Chicago, Illinois. At relevant times, Agape and/or Cosmo had a commodities and futures trading account with Transact.

24.    Defendant Alaron Trading Corporation ("Alaron") is a futures and commodities firm with a principal place of business at 822 W. Washington, Chicago, Illinois. At relevant times, Alaron was doing business as Alaron Futures and Options. Agape and/or Cosmo had a commodities and futures trading account with Alaron.

25.    Defendants XYZ Corps. 1-10 (the "FCMs") are futures and commodities firms or merchants whose identities are unknown at this time. Upon information and belief, Agape had commodities and futures trading accounts with these firms. These accounts were identified in the CFTC proceeding against Agape, and the names of these firms will be ascertained during discovery.

## FACTS

### The Cosmo/Agape Ponzi Scheme

26.    Commencing in 2003, and through to his arrest on January 19, 2009, Cosmo operated an elaborate Ponzi scheme. Initially through Agape World, and later AMA, Cosmo purportedly provided secured bridge loans and merchant advances to businesses or individuals who could not obtain financing through commercial banks. The bridge loans offered were short-term and supposedly secured by the underlying real estate or other assets. Cosmo and Agape sought investor money as capital for its bridge loans and promised

investors returns of 12 to 15% of their money.  Later, Cosmo supplemented his scheme by claiming to provide an investment vehicle into bridge loans for merchants carrying credit card accounts payable from month to month.

27.     Agape's website provided the scheme with an air of legitimacy by, among other things, using background pictures of construction and infrastructure projects.  A copy of Agape's website is annexed hereto as **Exhibit A**.  The website states that "project developers and contractors have sealed our services thru 2008".  This statement, like so many others made by Defendants, was false and fraudulent.

28.     Agape's website also contained information for investors.  Investors were advised that Agape did not decide to lend until it did "due diligence on the borrowers" and was "fully secure in [the] decision to take on the loan".  Agape represented that its "approved investors" would benefit from "99% security of [their] investment by first position UCC filing; "investors are in complete control of their funds and are able to access at any time"; "each loan is collateralized by 100% commercial asset lien"; "clients are consulted directly and personally with their executive every loan term"; and "loan terms range from 60 days to 18 months".

29.     These and similar false representations were made to investors who were attracted to Agape's seemingly safe and professional business plan and model.  Based largely upon the strength of its purported plan, and its burgeoning reputation, Agape successfully attracted funds from investors.

30.     To further attract investor funds, Agape developed relationships with approximately 12 "brokers" and "sub-brokers", John Does 1 to 12, who worked as employees or agents of Agape.  These brokers were given handsome cash payments for bringing new investors to

31.     Agape, directly and through the brokers, was able to raise an estimated $400 million of investor funds.  There are Agape investors located nationwide but many are life-long residents of Long Island such as police officers, post office employees, social security clerks and widows investing life insurance proceeds.

32.     Agape's success in drawing investment money was rapid.  It soon could afford large office space at 150 Motor Parkway in Hauppauge, New York, and could hire numerous employees.  Cosmo personally benefitted from this success with a lavish house and automobiles.  His brokers also were well compensated and many received millions from the scheme for their recruitment of new, innocent investors.   Agape's success, however, was not real, existed only for Cosmo and the other defendants, and was based entirely upon lies.

33.     In truth, Agape and Cosmo made only a handful of loans using investor funds.  In reality, Agape would sell and repeatedly re-sell the same interests in a loan.  For example, he would provide a $1 million dollar loan to a developer and collect $60 million from investors, effectively selling and re-selling the same loan over and over.  Agape never actually transacted the level of legitimate loan work and business needed to substantiate (or repay) the hundreds of millions of investor dollars received.

34.     Instead, Agape ran a fraudulent Ponzi scheme.  Agape had all investors write their

investment checks or wire their deposits into two primary operating accounts at Bank of

America.  Funds were also deposited directly into a series of accounts that were in the name

of Agape brokers.  Under Cosmo's direction, Bank of America commingled all of these

funds into these two accounts.  Funds were never segregated by investor or by underlying

project.  This commingling of investor money was approved and allowed to continue by

Bank of America contrary to standard and recognized banking practices.  Without this illegal

"shuffling" of funds, Agape's scheme would not have been able to survive.

35.     Using new investor money, Agape would issue returns from these co-mingled

accounts to the early investors, pay interest to investors and pay its "brokers" handsome and

outlandish commissions and fees.

36.     Agape also secretly engaged in highly speculative and risky commodities and futures

trading with investor money, and reportedly lost $80 million in such trading.  Upon

information and belief, Cosmo sought to earn enormous trading profits that would replace the

lack of business revenue from legitimate loans which he was not making.

37.     In short, Agape and Cosmo, with the substantial assistance of Bank of America,

engaged in a massive fraud and deceit upon Plaintiffs and other investors to "steal"  $400

million in capital, and then covered up the scheme and lies for as long as possible until the

cash ran out.  On January 19, 2009, Cosmo was arrested and charged with bank and mail

fraud and other related crimes.  He awaits trial and faces up to 30 years in prison if convicted.

A copy of the criminal complaint is annexed hereto as **Exhibit B**.

## Bank of America's Participation In The Fraud

38.     Historically, Ponzi schemes have not had the benefit of an affiliation with a credible and recognizable financial institution like Bank of America.  Financial institutions are supposed to abide by an array of strict regulatory requirements to avoid aiding and abetting illegal activities.  The legal requirements and best practices that set the standard for banking institutions are well outlined in various government and industry publications, including the Federal Financial Institutions Examinations Council's 2007 publication, "Bank Secrecy Act/Anti-Money Laundering Examination Manual."  In addition, all banks and financial institutions have the burden of knowing their customers and indentifying and reporting suspicious transactions.

39.     To meet such responsibilities and obligations, banks must have four types of programs in place, known in the industry as the "four pillars":  (1) a system of internal controls to ensure ongoing compliance; (2) independent testing of compliance; (3) designation of an individual or individuals responsible for compliance; and (4) training for appropriate personnel on potentially fraudulent transactions and money laundering activities. The requirements for these pillars have grown increasingly demanding, particularly as relates to customer due diligence and recognition of suspicious transactions.

40.     Because of such obligations, Bank of America further holds itself out to the public as having a policy of preventing crime and fraud via its website at

http://investor.bankofamerica.com/ phoenix.zhtml?c=71595&p=irol-govhighlights.  On the website, Bank of America states that:

> Crime has a destructive and devastating effect on the communities in which we operate. Safeguarding the global financial system is critically important for the economic and national security of the jurisdictions in which we operate. **Accordingly, it is the policy of Bank of America to take all reasonable and appropriate steps to prevent persons**

**engaged in money laundering, fraud, or other financial crime,** including the financing of terrorists or terrorist operations, (hereinafter collectively referred to as "money laundering") from utilizing Bank of America products and services.

41.　　Bank of America's program, however, failed to (1) respond to the blatant illegitimacy and unlawful nature of Agape's non-existent bridge loan business, (2) stop Agape and Cosmo from using the bank's products and services in furtherance of illicit purposes, and (3) halt Bank of America's involvement in the scheme including the establishment and maintenance of the Agape Branch.

42.　　Indeed, Bank of America failed to live up to any of its responsibilities or obligations in the case of Agape.　Rather, Bank of America was at the center of Agape's fraudulent Ponzi scheme, and far from shutting down the scheme or halt its own involvement in that scheme, it facilitated the scheme by providing Cosmo and his brokers with extraordinary access to its employees, infrastructure and banking services.　In effect, Bank of America knowingly participated and substantially assisted in Agape's fraud.　This fact is demonstrated by Bank of America allowing the establishment and operation of an onsite branch office at Agape's headquarters -- an "Agape Branch" -- to assist, facilitate and further the fraudulent scheme.

## The Bank of America "Agape Branch"

43.　　During its existence, Agape had a longstanding relationship with Bank of America, and its accounts were handled by the Bank of America branch located at 60 Hempstead Avenue, West Hempstead, NY  11552 ("Bank of America West Hempstead").　This is highly suspicious as the Bank of America West Hempstead branch is located 28 miles or a 36 minute drive from Agape's headquarters in Hauppauge past several other Bank of America branches, including one in Hauppauge in the very same commercial strip, less than a block from the Agape Headquarters.

44.     Agape and Cosmo transacted business through Bank of America West Hempstead because this branch would provide extraordinary and additional services for Agape, its single largest customer.  Additionally, upon information and belief, Cosmo's wife worked at one time at Bank of America West Hempstead and was known favorably by bank representatives, supervisors and compliance personnel at that office.

45.     Given the close and special relationship that Agape had with the Bank of America branch in West Hempstead, Bank of America took the extraordinary measure of effectively establishing a bank branch office within Agape -- the "Agape Branch".  This branch was staffed by a female bank representative who had been Agape's representative at Bank of America West Hempstead, but (on information and belief) was dedicated solely to Agape's needs and purposes.  At other times, other bank representatives also were assigned to the Agape Branch, also (on information and belief) for the sole needs and purposes of Agape.

46.     The Agape Branch of Bank of America consisted of a private office located behind but directly connected to Agape's main boardroom.  The office was located entirely within Agape's office space, with no separate entrance or exit way.  The onsite Bank of America representative in the office would have to walk through the entire length of Agape's office, and past its private offices including Cosmo's office, to access or leave.  The Bank of America onsite representative in the branch had: (1) access to virtually all aspects of Agape's business; (2) direct personal contact with its employees; and (3) could overhear and participate in business conversations.

47.     Within the dedicated private office at Agape, the Bank of America representative had the run of her office, with a desk, computer system and files.  The office had every appearance of a permanent established office.  The office also had computers and/or other

equipment providing a direct link to Agape's accounts at Bank of America and the ability for processing pay out checks and deposits that would ordinarily only be found at a normal bank branch.

48.     There did not appear to be any Bank of America supervisors or compliance personnel present at Agape to supervise this outside access to the bank's internal systems. Rather, it was the needs and purposes of Agape that drove operations.

49.     At the Agape Branch, the Bank of America representative had full access to Cosmo, and other Agape officers and employees, and they had full access to the bank's systems relevant to each of their many accounts. This access fully enabled Cosmo to perpetrate his fraudulent schemes to defraud investors by permitting him to transfer funds, make deposits, issue withdrawals--all outside of normal bank supervisory and compliance procedures and systems.

50.     The Agape Branch of Bank of America was not a secret. Most Agape employees and brokers were fully aware of the Agape Branch, and that Bank of America had a representative onsite. Several investors came to learn of the Agape Branch and its onsite bank representative. In short, Bank of America placed more than just its "imprimatur" on Agape and the propriety of its operations to the Agape employees, and investors who learned of the office. It became an integral and known part of the operation.

51.     Agape and Cosmo, through Bank of America representatives and/or the Agape Branch, were apparently further given access to information about cash balances held in bank accounts by investors who held savings or other bank accounts with Bank of America. Investors noticed that they would suddenly receive aggressive solicitations from Agape and Cosmo whenever they held large cash deposits in their bank accounts at Bank of America.

Apparently, with knowledge and access to bank account information obtained from Bank of America, Agape and Cosmo were able to engage in direct and targeted solicitations to investors to increase their investments. This knowledge and information about bank customers was confidential and private, and Bank of America violated confidentiality and privacy policies and laws by giving Agape and Cosmo access to this information. Thus, Bank of America further aided and abetted Agape's and Cosmo's schemes.

52.     Likewise, Bank of America apparently had access to Agape's investor list. Most Agape investors received numerous solicitations from Bank of America for bank accounts, credit card accounts, mortgages, home equity loans and investment products. Oftentimes, Bank of America extended "special offers" of low interest rates to Agape customers. These solicitations and "special offers" seemed directly targeted at Agape investors. The Bank of America representatives handling Agape's banking business likely received compensation awards and/or credits based upon the new business and revenues generated for Bank of America from Agape investors. Thus, Bank of America representatives handling Agape's business had financial incentives to maintain and promote Agape and Cosmo and/or violate bank policy and rules.

**An Investor Check for $162,500 Was Issued By the Agape Branch**

53.     During the December 2008 holiday season and during increased concerns about the state of the economy, numerous Agape investors wanted to withdraw cash. In particular, one investor wanted to withdraw approximately $200,000 of the funds he had invested in Agape.

54.     On December 24, 2008, an Agape broker went to Agape's office at 9:00 a.m. hoping to meet with Cosmo to obtain a check for the investor. At approximately 10:00 a.m., the Agape broker spoke with Cosmo and demanded that the investor receive the $200,000

immediately. The Agape broker was then directed to go to the "back office" at Agape (i.e., the Agape Branch) where he met with the dedicated Bank of America representative.

55.     The Agape broker requested a check for the investor, and the Bank of America representative then directly accessed an Agape account from her linked computer system, and issued a check from one of Agape's accounts to the investor for $162,500. The Bank of America representative then took the check to Cosmo's office which appeared to be the closest private office at Agape to the bank office where Cosmo signed the check and then gave it to the Agape broker who then gave it over to the investor.

56.     This incident reveals how Bank of America's presence amounted to Agape having in effect its own bank branch onsite -- the Agape Branch -- and how the proximity of a Bank of America representative with full access to bank computers and systems substantially assisted Agape's fraudulent schemes allowing it to move its monies rapidly and with little or no oversight, and (by acting as Agape's personal assistant) adding a patina of legitimacy to otherwise illegitimate acts.

### Bank of America Failed To Comply With Recognized Compliance And Regulatory Standards

57.     In addition to supplying personnel and creating the Agape Branch, Bank of America also had knowledge that Agape was engaged in highly suspicious and possible illegal activity on a regular and consistent basis. Rather than stop this conduct, Bank of America provided substantial assistance to Agape and facilitated this conduct which fueled the mechanics of Agape's fraud.

58.     First of all, Agape permitted Cosmo, a convicted felon, to open and control at least two dozen bank accounts held under various names. Bank of America knew or should have known of Cosmo's felony conviction from credit searches it performed in connection with

personal and/or business loans extended to him and Agape. Notwithstanding, Bank of America permitted Cosmo to control numerous bank accounts which held investor money and move monies without oversight or concern from account to account.

59.     Bank of America also permitted Cosmo and Agape to commingle investor money into Agape's "operating" accounts, with no segregation by investor name or by bridge loan. Bank of America had actual knowledge that Agape's deposits came from third-party investors. However, Agape never obtained any securities licenses required to solicit investors or registered as an issuer of securities for the interests it was selling to investors. Bank of America knew or should have known that Agape was committing violations of several federal and state securities laws through its transactions in the various bank accounts it held. Bank of America should have required segregation of investor funds and/or that funds be held in escrow accounts.

60.     Upon information and belief, Agape maintained 13 separate accounts at Bank of America, one of which was Agape's main "operating account" with 12 subsidiary accounts. At the end of each day, the 12 accounts transferred their funds to Agape's main account. AMA operated in the same manner with 13 accounts, a main operating account and 12 subsidiary accounts, with 12 accounts sweeping all the funds at the end of the day into the main account. Agape performed these suspicious daily sweeps for internal accounting purposes to credit and account for the broker's fees and commissions for raising capital.

61.     With these 13 accounts, Agape took in hundreds of millions of investor funds, but made only a few very minor bridge loans that were its primary business. At any time, Bank of America's review of these accounts would have seen that Agape utilized the investor deposits it received for: 1) its own operating expenses including lucrative payments to its

referring brokers; 2) wires and transfers totaling $100 million out to MF Global and the FCMs for speculation in the commodities and futures markets; 3) payments to Cosmo for his own lavish personal expenses; and 4) the issuance of interest payments or redemptions to investors. Bank of America could plainly see that all investor deposits and withdrawals went into and out of Agape's operating account, and Agape could not have gotten away with its fraud without the ability to freely move around, deposit, withdraw and transfer funds.

62.     Cosmo was also wiring funds out of the country to banks in Panama and/or Switzerland. Before his arrest, he reportedly visited Switzerland for the purpose of opening a Swiss bank account. Agape also wired funds out of the country to take advantage of interest earned from foreign deposits during after market hours.

63.     Multiple accounts and the other conduct described herein are all common "red flags" and recognized warnings to financial institutions to investigate, in order to satisfy their obligations under the Bank Secrecy Act and Anti Money Laundering statutes, that deposited funds are generated from a legitimate source of business operations.

64.     Federal laws and regulations, including but not limited to the Bank Secrecy Act, 31 U.S.C. §5311-5330, require Bank of America to file reports with federal law enforcement officials and the Department of the Treasury for suspicious activities and large currency transactions. Specifically, a Suspicious Activity Report must be filed regarding bank transactions or attempted transactions involving $5,000 or more that the financial institution knows, suspects, or has reason to suspect that the money was derived from illegal activities. Also, it must report cash transactions of $10,000 or more. Bank of America should have filed reports for the hundreds of millions of dollars that flowed through Agape's Bank of America

accounts until January 2009, which reports should have put Bank of America on notice of Agape's potentially fraudulent conduct.

65.     Bank of America continued over many months to aid and abet Agape's fraud and schemes despite several indicators of fraud and other suspicious conduct, including: (1) Agape's illegal raising of money from investors without required securities registration or licenses; (2) suspicious transfers of hundreds of millions of investor funds for purposes unrelated to Agape's purported business including $100 million to FCMs for speculation in the futures markets; (3) suspicious wires and transfers of funds out of the country; and (4) the well-known existence and prosecutions of numerous Ponzi schemes and persistent and high profile warnings from regulators.  These facts, and others alleged herein, include many "red flags" of the kind specifically identified as "Money Laundering Red Flags" by the Office of the Comptroller of the Currency in its publication for bankers, "Money Laundering: A Banker's Guide to Avoiding Problems." Bank of America, however, failed to heed these clear warning signs.

66.     Bank of America received significant fees from the financial transactions conducted in connection with Agape's business, the personal and business loans made to Agape, Cosmo and other Agape investors and/or employees.

**Bank of America Dismantled Its
KYC/AML High Risk Group**

67.     The Bank of America representative employed at the Agape Branch was part of its Premier Banking & Investments ("Premier Banking") group, and Agape was a Premier Banking customer.  Premier Banking was a separate and distinct group within Bank of America which offered premier banking services and integrated financial solutions (combining banking with investment services through its broker-dealer subsidiary) through a

coordinated relationship. Premier Banking employees or "associates" were employed in various branch offices but reported to a Bank of America office located at 100 Federal Street, Boston, Massachusetts.

68.     Bank of America's Premier Banking associates were responsible for adhering to the same Know Your Customer ("KYC") rules for establishing relationships as ordinary bank branch employees. The level of scrutiny should have been higher for Premier Banking customers since they were opening trading accounts and establishing broker relationships that required the bank to provide discretionary services. Generally, Bank of America's KYC rules required verification and understanding of the customer's source of deposits, nature of business conducted and background (including prior criminal convictions, if any). However, Premier Banking associates routinely failed to comply with KYC rules because: 1) they were inadequately trained and/or lacked minimum competence; 2) they were not subjected to any meaningful supervision and oversight; and/or 3) they were pressured by Bank of America's Senior Managers not to conduct due diligence because it would impede with generating banking business and revenues.

69.     Until early 2006, Bank of America had a specialized compliance group for Premier Banking located at its 100 Federal Street office which reviewed and supervised activity from its "Premier Banking & Investments" customers such as Agape. This compliance group enforced Bank of America's KYC rules and AML rules against any perceived "high risk" customers, and became known as the "High Risk Group".

70.     Any customers perceived as "high risk" by Premier Banking were supposed to be subjected to enhanced due diligence and KYC and AML rules and procedures enforced by the High Risk Group. Under these procedures, Bank of America employees were supposed

to strictly scrutinize Agape's business and Cosmo's background, and its wire and account transfers.  Had Bank of America's own internal KYC and AML due diligence procedures been performed properly, it is likely that Agape's business would have been turned away or referred to law enforcement authorities.

71.     Unfortunately, in early 2006, Bank of America dismantled its High Risk Group, released its 15-20 employees and ceased its enhanced scrutiny and compliance procedures.  Bank of America chose to shut down the High Risk Group because its compliance efforts to enforce proper KYC and AML procedures were impeding profitable and high margin business generation and revenues.   At first, Bank of America pressured employees of its High Risk Group to circumvent bank rules and/or approve business without proper due diligence.  Finally, Bank of America eventually just shut down the High Risk Group.

72.     In short, with foreknowledge that illicit or suspicious activity was occurring, Bank of America shut down its High Risk Group and chose revenue over compliance.  This conscious decision by Bank of America to dismantle its compliance and supervisory infrastructure, personnel and surveillance systems designed to detect and prevent frauds further facilitated and aided Agape's and Cosmo's fraud.

**Bank of America Lent Its Reputation To
Agape And Endorsed Its Fraud And Lies**

73.     In addition to the foregoing, Bank of America lent its name and reputation to Agape, and endorsed, rather than denounced, its fraud and lies on several separate occasions.  This conduct by Bank of America substantially assisted Agape's fraudulent schemes by giving investors confidence and reassurance from Agape's affiliation with the bank.  This conduct also delayed detection by investors of Agape's schemes.

74.     At the time of their investment with Agape, most investors were advised of its close relationship with Bank of America. Bank of America's name appears as "Banking Agent" on the Agape's investment forms which were to be completed by investors. Investors were instructed to write their checks out to Agape's account at Bank of America. Bank of America's name and reputation were thus incorporated and used as part of the selling process by Agape to investors.

75.     In marketing materials sent to investors, Agape touted its relationship with Bank of America. Upon information and belief, Bank of America was aware and condoned Agape's use of its name in investor contracts and marketing materials.

76.     In addition, various Agape investors borrowed funds from Bank of America through home equity or other loans to invest in Agape. For these investors, the Bank of America representative assisting them with the loan knew that the loan proceeds were originated to make investments with Agape. Theses investors were told by their Bank of America representative that making the loan to invest with Agape was a "great idea". Unfortunately, these investors have lost all of their money with Agape, and taking a loan for investment purposes was clearly not suitable for them.

77.     Upon multiple occasions, Bank of America representatives gave endorsements to investors about Agape or its business. For example, one Bank of America representative who was previously employed at the Bank of America West Hempstead branch, but later moved to a Wantaugh branch, stated to an investor that Agape was a "wonderful company" which had a substantial account at the bank and that Cosmo was a "great guy." This Bank of America employee further stated that she would "invest in the company if she could but there was a conflict of interest" given where she worked.

78.     Additionally, one Agape broker was advised by Cosmo that an investor's request for withdrawal of funds was delayed because Agape was waiting for a $28 million "balloon payment" from Bank of America on the Carriage House Marine Development Project in Maine.  Carriage House was a purported $83 million loan made by Agape and the broker was repeatedly told that the "balloon payment" would be coming in that would provide sufficient funds to pay numerous investors who were seeking redemptions.

79.     The Agape broker went to the Agape Branch and asked the onsite Bank of America representative if Agape had received the $28 million balloon payment which Cosmo told him was imminent.  The Bank of America representative indicated that balloon payment from Carnegie House had "not hit yet".  However, the Bank of America representative failed to inform the Agape broker that the balloon payment was only $1 million and not $28 million, and that Cosmo had lied about the amount of funds expected.  Her failure to tell the truth and reveal the lie constitutes fraud by material omission as well as furthered the lie that Agape's business was legitimate and thriving.

80.     In sum, Bank of America's conduct provided substantial assistance to Cosmo's and Agape's known fraud.  Bank of America's onsite representatives and compliance personnel had actual knowledge that Cosmo was commingling investor money, diverting investor money to his own accounts, engaging in no legitimate business and speculatively trading investor money in the commodities and futures markets.  Bank of America not only assisted Agape with its actions but provided an onsite Agape Branch complete with access to its systems and a personal representative.  Accordingly, Bank of America should be held liable for Agape's fraud which destroyed $400 million of investor money.

81.     This is not the first time Bank of America has been the subject of claims by its customers for widespread institutional failures to comply with its requirements under the Bank Secrecy Act/Anti-Money Laundering laws.  In *Collins et al. v. Adsurfdaily, Inc.*, 09-CV-00100 (D.D.C. filed January 15, 2009), Bank of America was sued by online advertising consumers for its role in providing substantial assistance to another Ponzi scheme in the tens of millions.  In that case, Bank of America likewise allegedly breached its obligations and duties to detect and prevent fraud and protect consumers.  Accordingly, Bank of America has systemic inadequacies and institutional failures which put all banking customers and the public at significant risk.

## MF Global And The FCMs' Participation In The Fraud

82.     From November 2007 to January 2009, MF Global, Transact and Alaron, futures and commodities trading firms, and XYZ Corps. 1-10 (the "FCMs"), which represent other futures and commodities merchants and trading firms whose identities are unknown at this time, also provided substantial assistance to Cosmo's fraudulent schemes.  MF Global, Transact, Alaron and the FCMs established trading accounts for Cosmo and Agape despite the fact that Cosmo was barred by FINRA for life from association with any investment broker-dealer. These FCM's either knew of that bar and chose to ignore it or failed to undertake even the most cursory of due diligence efforts.  Indeed, other firms such as Dorman Trading and R.J. O'Brien refused Cosmo's business. As speculating in the futures markets was Agape's only business activity, MF Global and the FCMs assisted Cosmo in running an illegal unregistered commodities pool. As a result, the Commodity Futures

Trading Commission ("CFTC") commenced a proceeding against Agape and Cosmo. A copy of the CFTC's Complaint is annexed hereto as **Exhibit C**.

83.     Cosmo's and Agape's speculative commodities futures trading resulted in losses which reportedly wiped out $80 million of the investor funds. Cosmo looted Agape with his trading through MF Global, Transact, Alaron and the FCMs which never should have accepted this business. MF Global and the FCMs have "know your customer duties" which require these firms to make sure that Cosmo and Agape were not trading with investor money. Had the FCMs simply reviewed Agape's website, they would have realized that he was trading other investors' money without obtaining proper registration. Cosmo also assigned an uneducated and inexperienced "administrative assistant" to execute most of the trades. This "assistant" had no understanding of what she was doing, and MF Global and the FCMs should never have done business through her.

84.     In sum, MF Global and the FCMs substantially assisted Agape's and Cosmo's fraud, and the trading losses perpetrated even further fraud.

85.     Upon information and belief, Cosmo began trading on the commodities market when he finally needed some manner of generating revenues to cover calls from investors for monies. Upon information and belief, Cosmo traded futures with Agape funds through the FCMs to generate revenues. Instead, he suffered enormous losses from his trading which put more pressure on him to raise additional money from investors. His futures trading perpetuated the cycle, resulting in further fraud against additional investors, as well as increased losses.

86.     Upon information and belief, the FCMs profited substantially from Cosmo's and Agape's illicit trading. The trading generated enormous revenues for the FCMs at the

expense of Agape's investors. Thus, the FCMs had every incentive to "look the other way" about the source of Agape's funds, and ignore the "red flags" that Cosmo and Agape was illicitly trading investor money and looting his company.

## CLASS ACTION ALLEGATIONS

87.     Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), Plaintiffs bring this nationwide class action on behalf of themselves and all other persons in the United States who within the applicable statute of limitations of the date of the commencement of this action have lost any money invested or paid to Agape. This class seeks certification for claims for declaratory and injunctive relief, and for damages caused by securities fraud, common law fraud and breach of fiduciary duty, and aiding and abetting fraud, breach of fiduciary duty and negligence.

88.     Excluded from the Class are all Defendants and the directors, officers, predecessors, successors, affiliates, agents, co-conspirators and employees of all Defendants, as well as the immediate family members of such persons.

89.     All Class members have suffered injury to their property by reason of all Defendants' unlawful course of conduct, including their fraud, breaches of fiduciary duties, and aiding and abetting fraud and breaches of fiduciary duties.

90.     The Class is reasonably estimated to be in the range of 1,500 to 6,000 members, and is thus so numerous that joinder of all its members is impracticable. The precise number of Class members and their addresses are unknown to Plaintiffs, but can be ascertained through appropriate discovery of all of Defendants' records. Class members may be notified of the pendency of this action by publication and/or other notice.

91.     There is a well-defined community of interest in the relevant questions of law and

fact affecting putative Class members.  Common questions of law and fact predominate over

any individual questions affecting Class members, including but not limited to whether: (1)

Agape and Cosmo misrepresented the loan investments they offered to Plaintiffs and

obtained investor money through securities fraud, fraud, deceit and false pretenses; (2) Agape

and Cosmo instead ran a Ponzi scheme with investor funds; (3) Agape and Cosmo illicitly

traded $100 million of investor funds speculating in the commodities and futures markets; (4)

Bank of America substantially assisted Agape's and Cosmo's fraud through its establishment

of the Agape Branch, by placing an onsite bank representative, computer systems and

equipment at Agape; (5) Bank of America substantially assisted Agape's and Cosmo's fraud

by breaching its obligations under the Bank Secrecy Act and Anti-Money Laundering laws;

(6) Bank of America aided and abetted Agape's and Cosmo's fraud; and (7) the FCMs aided

and abetted Agape's and Cosmo's fraud.

92.     The claims of Plaintiffs and other Class members have a common origin and share a

common basis.  The claims originate from the same illegal conduct alleged herein on the part

of all Defendants and other unnamed co-conspirators and their acts in furtherance of the

illegal conduct.  Plaintiffs' claims are typical of those of the absent Class members.  If

brought and prosecuted individually, the claims of each Class member would require proof of

many of the same material and substantive facts, rely upon the same remedial theories, and

seek the same relief.

93.     Plaintiffs will fairly and adequately protect the interests of the Class and have no

interests adverse to or that directly and irrevocably conflict with the interests of other Class

members.  Plaintiffs are willing and prepared to serve the Court and the putative Class in a

representative capacity with all of the obligations and duties material thereto. Plaintiffs have retained the services of counsel, identified below on the signature page, who are experienced in complex class-action litigation and in particular actions involving consumer matters. Plaintiffs' counsel will adequately prosecute this action and will otherwise assert, protect, and fairly and adequately represent Plaintiffs and all absent Class members.

### Rule 23(b)(3)

94.     The prosecution of separate action by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the class. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof, and legal theories would also create and allow the existence of inconsistent and incompatible rights within the Class.

95.     A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because: (1) individual claims by the Class members would be impracticable as the costs of pursuit would far exceed what any one Class member has at stake; (2) little individual litigation has been commenced over the controversies alleged in this Complaint, and individual Class members are unlikely to have an interest in separately prosecuting and controlling individual actions; (3) the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and (4) the proposed class action is manageable.

### Rule 23(b)(2)

96.     The Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

# ALLEGED COUNTS

## COUNT ONE
### SECURITIES FRAUD
(Agape World, Cosmo, AMA and John Does 1-10)

97.     Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

98.     Defendants, Agape World, Cosmo, AMA and John Does 1-10 violated §10b of the Exchange Act and Rule 10b-5 through the use of the mails and means of interstate commerce fraudulently induced Plaintiffs to purchase securities being solicited and marketed by these Defendants through the use of materially false and misleading sales materials, oral representations, electronic communications.

99.     These Defendants knowingly made material false statements to Plaintiffs in connection with the securities offered about Agape's backgrounds, business and operations, handling of investor money, and source and application by Agape of investor funds.  These Defendants made false representations, among other things, about the business reputation of principals of Agape, the legality of Agape's program, the ability of Agape investors to earn investment returns while their investment principal was secure, and the ability of Agape investors to redeem their investments and receive the return of their money. Furthermore, these Defendants touted and utilized Agape's relationship with Bank of America to enhance the apparent legitimacy of the scheme and to promote the ease of financial transactions with Agape through Bank of America. These Defendants induced through materially false statements and omissions the Plaintiffs and Class members who justifiably relied upon them, into making investments in securities through Agape, and entrusting funds to Agape.  By so

doing, these Defendants committed securities fraud under §10b of the Exchange Act and Rule 10b-5.

100.    As a result of these Defendants' securities fraud, Plaintiffs and the Class members have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.


<u>**COUNT TWO**</u>
**COMMON LAW FRAUD**
**(Agape World, Cosmo, AMA and John Does 1-10)**

101.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

102.    Defendants Agape World, Cosmo, AMA and John Does 1-10 owed duties to Plaintiffs and Class members to truthfully and accurately communicate to them and to disclose material information about Agape and Cosmo, their backgrounds and experience, their loan investment plan, their business and operations, the returns earned by investors, the source and application of Agape's operating funds, and Agape's handling of funds received from investors.  These Defendants had further duties to truthfully and accurately communicate to investors Agape's true financial condition and any other information which might reasonably be expected to affect an investor's decision-making.

103.    These Defendants breached their obligations to investors by deceiving, misrepresenting, lying and materially omitting numerous facts or information about their backgrounds, business and operations, handling of investor money, and source and application by Agape of investor funds.  These Defendants made false representations, among other things, about the business reputation of principals of Agape, the legality of the

Agape's program, the ability of Agape investors members to earn investment returns while their investment principal was secure, and the ability of Agape investors to redeem their investments and receive the return of their money. Furthermore, these Defendants touted and utilized Agape's relationship with Bank of America to enhance the apparent legitimacy of the scheme and to promote the ease of financial transactions with Agape through Bank of America. These Defendants induced the investors based upon deceit, fraud and false pretenses into making investments through Agape, and entrusting funds to Agape. By so doing, these Defendants committed common law fraud, deceit and misrepresentation towards Plaintiffs and Class members. Plaintiffs and Class members thereby lost money that was paid to Agape.

104.    As a result of these Defendants' common law fraud, deceit and misrepresentation, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

**COUNT THREE**
**BREACH OF FIDUCIARY DUTY**
**(Agape World, Cosmo, AMA and John Does 1-10)**

105.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

106.    Defendants Agape World, Cosmo, AMA and John Does 1-10 owed a fiduciary duty to Plaintiffs and Class members. These Defendants gained the trust and confidence of Plaintiffs and Class members by the assured legality, safety, honesty and success of Agape's loan investment program.

107.    These Defendants breached the obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision. These Defendants made

representations, among other things, about the business reputation of principals of Agape, the legality of the Agape's program, the ability of Agape investors members to earn investment returns while their investment principal was secure, and the ability of Agape investors to redeem their investments and receive the return of their money. Furthermore, these Defendants touted and utilized Agape's relationship with Bank of America to enhance the apparent legitimacy of the scheme and to promote the ease of financial transactions with Agape through Bank of America. These Defendants established a fiduciary duty by building a relationship of confidence and trust with investors by advising them on loan investments to make, amounts to invest and assisting the investors in making investments through Agape. By so doing, these Defendants undertook to provide financial advice to Plaintiffs and Class members and to hold in trust investor funds for the purpose for which they were obtained. These Defendants breached their fiduciary duties to Plaintiffs and Class members by making false representations and promises about Agape's non-existent loan investments, by withholding from Plaintiffs and Class members the return of principal on investments Plaintiffs and Class members made or paid to Agape, by speculatively trading in the commodities and futures markets and by engaging in a Ponzi scheme. Plaintiffs and Class members thereby lost money that was paid to Agape.

108.    As a result of these Defendants' breaches of their fiduciary duty, Plaintiffs and the Class members have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

## COUNT FOUR.
## AIDING AND ABETTING COMMON LAW FRAUD
### (Bank of America and the FCMs)

109.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

110.    Defendants Agape World, Cosmo, AMA and John Does 1-10 owed duties to Plaintiffs and Class members to truthfully and accurately communicate to them and to disclose material information about Agape and Cosmo, their backgrounds and experience, their loan investment plan, their business and operations, the returns earned by investors, the source and application of Agape's operating funds, and Agape's handling of funds received from investors.  These Defendants breached their obligations to investors by deceiving, misrepresenting, lying and materially omitting numerous facts or information about their backgrounds, business and operations, handling of investor money, and source and application by Agape of investor funds.  By so doing, these Defendants committed fraud, deceit and misrepresentation towards Plaintiffs and Class members.

111.    Bank of America aided and abetted, encouraged, and rendered substantial assistance to these Defendants to accomplish the fraud and wrongful acts complained of herein.  In aiding and abetting and substantially assisting the commission of the acts complained of, Bank of America acted with an awareness of Agape's wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein, including but not limited to:  (1) Bank of America's assignment of more than one representative to work out of Cosmo's office; (2) Bank of America provided its onsite representatives at Agape with on site bank equipment and/or computer systems, and direct and immediate access to Bank of America's accounts and systems; and (3) Bank of

America's onsite representatives at Agape had the ability to monitor and check account balances, accept deposits and issue checks. Essentially, Bank of America established a fully functional bank branch manned by its own representatives within Agape's offices -- the Agape Branch -- which provided assistance to Agape's and Cosmo's schemes.

112.    Additionally, Bank of America, through its onsite Agape Branch, as well as its other branches which dealt with Agape further provided substantial knowing assistance to Agape's schemes through: (1) contrary to industry standards and in violation of recognized compliance requirements, allowing a convicted felon to control at least two dozen actively utilized and interrelated accounts, all under different names; (2) on a regular basis (perhaps as often as once an evening) aggregating funds totaling several millions of dollars and approving and effecting transfers of the funds between and among various Agape bank accounts; (3) failing to act on the fact that Agape and Cosmo engaged in no legitimate business loans and were selling securities with required licenses or registration; (4) on a regular basis, approving and effecting transfers of up to $100 million dollars in wires to commodities and futures trading firms for speculative transactions which looted Agape's assets; and (5) failing to investigate the hundreds of millions of dollars of transferred funds and funds going into Cosmo's accounts (and particularly given his criminal record and lack of legitimate business enterprise to support the account) despite compliance and legal requirements and its own policies and procedures for fraud detection.

113.    Bank of America further provided substantial assistance to Agape's and Cosmo's known fraud. Upon information and belief, Bank of America's onsite representatives and compliance personnel had actual knowledge that Cosmo was commingling investor money, diverting investor money to his own accounts, engaging in virtually no legitimate business

whatsoever and speculatively trading investor money in the commodities and futures markets. Bank of America should be held liable for its wrongful acts which aided and abetted the fraud committed against Plaintiffs and the Class members.

114.     The FCMs aided and abetted, encouraged, and rendered substantial assistance to these Defendants to accomplish the fraud and wrongful acts complained of herein. In aiding and abetting and substantially assisting the commission of the acts complained of, the FCMs acted with an awareness of Agape's wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein, including but not limited: (1) aiding and facilitating Cosmo who was barred from association with any investment broker-dealer to run an illegal unregistered commodities pool; (2) aiding and facilitating the looting of Agape through highly speculative commodities and futures trading which resulted in $80 million of losses; (3) breaching its "know your customer" obligations; (4) aiding and facilitating an unqualified "administrative assistant" to trade $100 million in the commodities and futures markets; (5) aiding and assisting Agape's Ponzi scheme by accepting deposits and wire transfers without verifying the source and propriety of the funds for trading. This conduct by FCMs aided and abetted the fraud perpetrated against the Plaintiffs and the Class members.

115.     As a result of the wrongful conduct of Bank of America and the FCMs, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

**COUNT FIVE**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Bank of America and the FCMs)**

116.     Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein

117.     Defendants, Agape World, Cosmo, AMA and John Does 1-10 owe a fiduciary duty to Plaintiffs and Class members.  These Defendants breached the obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  These Defendants breached these fiduciary obligations and duties by (1) making representations, among other things, about the business reputation of principals of Agape, the legality of Agape's program, the ability of Agape investors to earn investment returns while their investment principal was secure, and the ability of Agape investors to redeem their investments and receive the return of their money; (2) diverting Plaintiffs and Class members' money from the purposes for which it was given to Agape; (3) withholding from Plaintiffs and Class members the return of principal on investments Plaintiffs and Class members made or paid to Agape; and (4) using investor funds for trading in the speculative commodities and futures markets; and (5) engaging in a Ponzi scheme.

118.     Bank of America aided and abetted, encouraged, and rendered substantial assistance to these Defendants for wrongful acts complained of herein which breached their fiduciary duties.    In aiding and abetting and substantially assisting the commission of the acts complained of, Bank of America acted with an awareness of Agape's wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein, including but not limited to: (1) Bank of America's assignment of more than one representative to work out of Cosmo's office which was

38

approximately 28 miles from the branch where Agape and Cosmo had their bank accounts; (2) Bank of America provided its onsite representatives at Agape with on site bank equipment and/or computer systems and direct access to Bank of America's accounts and systems; and (3) Bank of America's onsite representatives at Agape had the ability to monitor and check account balances, accept deposits and issue checks. Essentially, Bank of America established a fully functional bank branch manned by its own representatives within Agape's offices -- the Agape Branch -- which provided assistance to Agape's and Cosmo's schemes.

119.    Additionally, Bank of America, through its onsite Agape Branch, as well as its other branches which dealt with Agape further provided substantial knowing assistance to Agape's schemes through: (1) contrary to industry standards and in violation of recognized compliance requirements, allowed a convicted felon to control at least two dozen accounts, all under different names; (2) on a regular basis (perhaps as often as once an evening) aggregating funds totaling several millions of dollars and approving and effecting transfers of the funds between and among various Agape bank accounts; (3) failing to detect that Agape and Cosmo engaged in no legitimate business loans and were selling securities with required licenses or registration; (4) on a regular basis, approving and effecting transfers of up to $100 million dollars in wires to commodities and futures trading firms for speculative transactions which looted Agape's assets; (5) failing to investigate the hundreds of millions of dollars of transferred funds and funds going into Cosmo's accounts (and particularly given his criminal record and lack of legitimate business enterprise to support the account) despite compliance and legal requirements and its own policies and procedures for fraud detection.

120.     Bank of America further provided substantial assistance to Agape's and Cosmo's known fraud.  Upon information and belief, Bank of America's onsite representatives and compliance personnel had actual knowledge that Cosmo was commingling investor money, diverting investor money to his own accounts, engaging in virtually no legitimate business whatsoever and speculatively trading investor money in the commodities and futures markets.  Bank of America should be held liable for its wrongful acts which aided and abetted the breaches of fiduciary duty committed against Plaintiffs and the Class members.

121.     The FCMs aided and abetted, encouraged, and rendered substantial assistance to these Defendants to wrongful acts complained of herein which breached their fiduciary duties.  In aiding and abetting and substantially assisting the commission of the acts complained of, the FCMs acted with an awareness of Agape's wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein, including but not limited: (1) aiding and facilitating Cosmo who was barred from association with any investment broker-dealer to run an illegal unregistered commodities pool; (2) aiding and facilitating the looting of Agape through highly speculative commodities and futures trading which resulted in $80 million of losses; (3) breaching its "know your customer" obligations; (4) aiding and facilitating an unqualified "administrative assistant" to trade $100 million in the commodities and futures markets; (5) aiding and assisting Agape's Ponzi scheme by accepting deposits and wire transfers without verifying the source and propriety of the funds for trading.  This conduct by the FCMs aided and abetted breached of fiduciary duties owed to Plaintiffs and the Class members.

122.    As a result of the wrongful conduct of Bank of America and the FCMs, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

**COUNT SIX**
**NEGLIGENCE**
**(All Defendants)**

123.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein

124.    All Defendants owed Plaintiffs duties of ordinary and reasonable care which arise from their relationships with them and their position and status.  Bank of America and the FCMs owe Plaintiffs and Class members duties of ordinary and reasonable care applicable to banks, financial institutions and futures commodities merchants, as well as just and equitable principals of their respective trades. All Defendants breached their duties owing to Plaintiffs and Class members.

125.    The Agape Defendants breached their obligations to Plaintiffs and Class members by deceiving, misrepresenting, lying and materially omitting numerous facts or information about their backgrounds, business and operations, handling of investor money, and source and application by Agape of investor funds.

126.    Bank of America breached its obligations to Plaintiffs and Class members by these acts: Bank of America aided and abetted, encouraged, and rendered substantial assistance to these Defendants for wrongful acts complained of herein which breached their fiduciary duties.  In aiding and abetting and substantially assisting the commission of the acts complained of, Bank of America acted with an awareness of Agape's wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful

conduct and scheme alleged herein, including but not limited to: (1) Bank of America's assignment of more than one representative to work out of Cosmo's office which was approximately 28 miles from the branch where Agape and Cosmo had their bank accounts; (2) Bank of America provided its onsite representatives at Agape with on site bank equipment and/or computer systems and direct access to Bank of America's accounts and systems; and (3) Bank of America's onsite representatives at Agape had the ability to monitor and check account balances, accept deposits and issue checks; (4) contrary to industry standards and in violation of recognized compliance requirements, Bank of America allowed a convicted felon to control at least two dozen accounts, all under different names; (5) on a regular basis (perhaps as often as once an evening) Bank of America aggregated funds totaling several millions of dollars and approved and effected transfers of the funds between and among various Agape bank accounts; (6) Bank of America failed to detect that Agape and Cosmo engaged in no legitimate business loans and were selling securities with required licenses or registration; (7) on a regular basis, Bank of America approved and effected transfers of up to $100 million dollars in wires to commodities and futures trading firms for speculative transactions which looted Agape's assets; (8) Bank of America failed to investigate the hundreds of millions of dollars of transferred funds and funds going into Agape's and Cosmo's accounts (and particularly given his criminal record and lack of legitimate business enterprise to support the account) despite compliance and legal requirements and its own policies and procedures for fraud detection.

127. The FCMs breached their obligations to Plaintiffs and Class members by (1) aiding and facilitating Cosmo who was barred from association with any investment broker-dealer to run an illegal unregistered commodities pool; (2) aiding and facilitating the looting of

Agape through highly speculative commodities and futures trading which resulted in $80 million of losses; (3) breaching its "know your customer" obligations; (4) aiding and facilitating an unqualified "administrative assistant" to trade $100 million in the commodities and futures markets; (5) aiding and assisting Agape's Ponzi scheme by accepting deposits and wire transfers without verifying the source and propriety of the funds for trading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment in its favor:  For an order certifying the Class as defined herein.  For an order requiring disgorgement and restitution of Defendants' ill-gotten gains and payment of restitution to Plaintiff and the Class all funds acquired by means of the fraudulent scheme complained of above.  For compensatory, special and general damages according to proof but in an amount estimated to be not less than, and likely in excess of **$400 million**.  For an order authorizing Plaintiff and the Class an equitable accounting.  For reasonable attorneys' fees and costs of investigation and litigation under 18 U.S.C. §1964(c).  For punitive damages in an amount sufficient to punish and deter future similar conduct; and For prejudgment interest; and For such other and further relief as the interests of law or equity may require.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

DATED:  April 27, 2009           **SEEGER WEISS LLP**

                              /s/_____
                              Scott Alan George, Esq. (Admitted *Pro Hac Vice*)
                              1515 Market Street, Suite 1380
                              Philadelphia, PA 19102
                              Tel: 215-564-2300
                              Fax: 215-851-8029

**ZAMANSKY & ASSOCIATES LLC**
Jacob H. Zamansky (Bar No. JZ 1999)
Edward H. Glenn, Jr. (Bar No. EG 0042)
50 Broadway, 32nd Floor
New York, New York 10004
Tel: (212) 742-1414
Facsimile: (212 742-1177


**BERK LAW LLC**
Steven N. Berk
1225 Fifteenth Street, NW
Washington, D.C. 20005
Tel: (202) 232-7550
Facsimile: (202) 232-7556

**SEEGER WEISS LLP**
Christopher Seeger
Stephen Weiss
One William Street
New York, New York 10004
Tel: (212) 584-0700
Fax: (212) 584-0799

Attorneys for Plaintiffs